Argued December 6, affirmed December 28, 1915.

## SCHUCKING v. YOUNG.*

(153 Pac. 803.)

**Sales—Construction of Contract—When Character "#" Signifies "Pounds."**

1. In a contract reciting that the grower has sold and agreed to deliver to the plaintiff "25,000 # of 1913 hops at 14 cents per pound," the hieroglyphic "#" when placed before a figure imports "number," and when placed after a figure signifies "pounds."

**Sales—Breach of Contract—Buyers Offer to Perform.**

2. By the terms of a contract for the sale of hops in which the seller agreed to deliver the hops on cars in Oregon, at the point selected by him, but before such delivery would be complete, plaintiff was required to inspect and receive them, upon written notice from plaintiff demanding that he be permitted to inspect and receive the hops, and at same time gave defendant notice that upon such inspection he would pay the full purchase price, such notice being wholly ignored by the defendant, amounted to a refusal to comply with the terms of such contract.

**Contracts—Breach—Waiver of Tender of Performance or Ability to Perform Contract.**

3. It is settled law that a declaration made by one of the contracting parties prior to the time fixed for the performance, that he will not comply with such contract, if not withdrawn, dispenses with any offer to perform by the other before bringing an action for breach of contract.

---

*On the right to abandon performance of contract and recover for breach of other party, see note in 30 L. R. A. 54.          REPORTER.

Sales—Evidence of Ability of Buyer to Comply With Contract is Question for Jury.

4. Evidence in an action by a buyer for breach of a contract to sell and deliver certain hops examined, and *held* sufficient to authorize submitting to the jury the question whether plaintiff would have been able to have paid the contract price, if his offer to inspect and receive the hops had been accepted.

Pleading—Allegations in Complaint Admitted in Answer.

5. Where the complaint alleged full compliance with Laws of 1913, page 272, Section 5, relating to firm names, and defendant's answer admits such allegations to be true, such admission relieves plaintiff from proving the allegation admitted, the same being considered conclusive evidence of such facts. *Beamish* v. *Noon*, 76 Or. 415 (149 Pac. 522), followed.

Sales—Breach of Contract—Variance Between Pleadings and Proof.

6. In an action for breach of a contract to sell and deliver a certain number of pounds of hops, it was alleged in the first paragraph of the complaint that plaintiff was doing business in the name of a firm, and in the second paragraph that the contract was entered into with the firm, and as shown by the contract introduced in evidence the firm was the buyer, there is no such variance as could have misled defendant to his prejudice, within Section 97, L. O. L.

Appeal and Error—When Admission of Immaterial Evidence is Harmless.

7. In an action to recover damages for breach of a contract in which Y. agreed to sell and deliver "25,000# of 1913 hops at 14 cents per pound," the admission of immaterial testimony as to the custom of hop buyers in the use of the hieroglyphic, #, was harmless.

Evidence—Documentary Evidence—Erasures and Alterations in Contract.

8. In an action for breach of a contract to sell and deliver hops, testimony of plaintiff *held* to show that all alterations and erasures appearing in the contract were made either before it was executed or by consent of the parties, and no error was committed in the admission of the document in evidence.

Evidence—Documentary Evidence—Effect of Testimony on Rebuttal.

9. On rebuttal, plaintiff having corrected his testimony in chief as to the time when the alterations and erasures appearing in the contract introduced by him in evidence were made, did not make the document inadmissible or the act admitting it erroneous.

From Marion: PERCY R. KELLY, Judge.

Department 1.    Statement by MR. JUSTICE McBRIDE.

This is an action by B. O. Schucking & Company against E. M. Young, for damages for breach of a contract to sell and deliver hops. The material portions of the complaint are as follows:

"I.   That B. O. Schucking is now, and was at all the times hereinafter mentioned doing business under the name and style of B. O. Schucking & Co., and prior hereto has filed a certificate in the office of the county clerk of Marion County, Oregon, setting forth the name and style under which said business was to be conducted and the true name of the party conducting the same, together with his postoffice address, which certificate was duly executed and acknowledged by the plaintiff before an officer authorized to take acknowledgments of deeds. .

"II.   That on the 16th day of December, 1912, the plaintiff and the·defendant entered into a contract whereby the said defendant promised and agreed to sell and deliver to said plaintiff 25,000 pounds of 1913 hops at and for the agreed price of 14 cents per pound, to be delivered f. o. b. cars Oregon, subject to inspection and acceptance, bales to be in good merchantable order, weighing from 185 to 205 pounds each, purchase made severable as to bales, and B. O. Schucking & Co. to inspect and receive hops from October 1 to November 15, 1913.

"III.   That the reasonable market value of said hops from the 1st day of October, to and including the 15th day of November, 1913, was 23 cents per pound.

"IV.   That plaintiff was continuously from the 30th day of September, 1913, until November 16, 1913, inclusive, ready, able, and willing to receive said hops at any time and place within the State of Oregon which the defendant might designate, and upon such receipt to pay the defendant the full amount of the purchase price therefor in accordance with said contract.

"V.   That on the 4th day of November, 1913, the plaintiff requested the defendant to designate the time and place he would be ready to deliver to him the 25,000 pounds of hops mentioned in said contract, which the defendant failed and refused to do, or to indicate the time or place he would deliver to plaintiff the hops in accordance with said agreement, and failed and refused to permit the plaintiff to inspect, receive, accept, or pay for said hops. On the 13th day of

November, 1913, the plaintiff went to the residence and place of business of the defendant in Polk County, Oregon, between the hours of 10 A. M. and 4 P. M., for the purpose of inspecting, receiving, and paying the defendant the purchase price of said hops in accordance with the terms of said contract, and was at said time ready, able, and willing to receive, inspect, and pay for the same in accordance with said agreement, at which time the defendant failed to communicate with plaintiff or make his presence at said place known to the plaintiff, and failed and neglected to permit the plaintiff to inspect, receive, or pay for said hops in accordance with agreement. That thereafter on said 13th day of November, 1913, the said plaintiff served upon the defendant a writing, demanding that defendant permit plaintiff on the 15th of November, 1913, or at any time, to inspect and receive the hops mentioned and described in said contract, said inspection and receiving to be at any convenient place within the State of Oregon which defendant might designate, and that the defendant notify the plaintiff of the time and place where said inspection could be had and hops received. Plaintiff further notified defendant at said time that on said date, or upon the inspection and receipt of said hops, he would pay the defendant the full amount of the purchase price therefor, amounting to $3,500. That defendant refused and neglected to comply with the terms of said notice or to make any objection to its contents, and failed and refused to notify the plaintiff of any time and place where said inspection could be had and hops received, and failed and refused to permit defendant to inspect, receive, or pay for said hops in accordance with said contract, on the 15th day of November, 1913, or at any time or place at which the plaintiff was ready, able, and willing to receive, inspect, and pay for said hops according to the terms of said contract.

"VI. That the defendant has failed, neglected, and refused to perform any of the conditions or terms of said contract, or to deliver to plaintiff said 25,000

pounds of hops, or any hops, as in said contract pro-
vided.

"VII.   That by reason of the failure of the defend-
ant to perform such agreement upon his part, as afore-
said, the plaintiff is damaged in the sum of $2,250,
which sum has not been paid, nor any part thereof."

The defendant answered, admitting all of paragraph
I of the complaint, and interposed a general denial to
the remainder.   Upon the trial the plaintiff offered in
evidence the following paper:

                "Salem, Oreg., Dec. 16th, 1912.
"In consideration of one dollar, the receipt whereof
is hereby acknowledged, I have this day sold to B. O.
Schucking & Co. 25000 # ~~prime~~ 1913 ~~bales~~ of ~~my 10
growth of~~ hops ~~like sample submitted~~ at 14 cents per.
pound (tare 5 lbs.), delivered f. o. b. cars Oregon, sub-
ject to inspection and acceptance.   Bales to be in good
merchantable order, weighing from 185 to 205 lbs.
each.   Purchase made severable as to bales and B. O.
Schucking & Co. to inspect and receive hops, October
1st to November 15th, 1913.
                "E. M. YOUNG.
                "B. O. SCHUCKING."

Plaintiff testified that the symbol, #, was a symbol
designating pounds when placed after figures, and was
so understood at the time the contract was made.
Among others, the following questions were asked and
answered over defendant's objection:

"Q. You are familiar with the use of that symbol
here among hop-growers, are you?

"A. Amongst hop-growers?

"Q. Amongst buyers.

"A. I am familiar with the usage of that symbol as
designating 'pounds.'

"Q. Among the hop buyers?

"A. Well, I don't know whether—they all use them
at times, but it is an abbreviation for pounds and sym-
bol used therefor."

Defendant called expert witnesses, who testified that the character, #, when used in commercial transactions, signified number. Some of them testified, however, that as used in the contract under consideration they would interpret it as signifying "pounds"; others that they would not be able to say what it denoted. The defendant admitted upon cross-examination it was the intent of the contract that it should call for the delivery by him of 25,000 pounds of hops. The plaintiff testified, in substance, that upon the eighth day of November, 1913, he met defendant in Salem, and asked him when he was going to deliver the hops under the contract, and that the defendant replied:

"I am not going to deliver. You don't think that contract of yours is any good?"

He stated that on November 13th he went to defendant's residence, and, not finding him at home, served upon him by leaving with his wife a notice demanding permission to inspect and receive the hops mentioned in the contract, said inspection to be at any convenient place within the State of Oregon which the defendant might designate, and upon such inspection and delivery plaintiff in said notice offered to pay defendant the full amount of the purchase price, namely, $3,500. To this demand defendant made no response, and never at any time designated a time when or place where plaintiff might inspect or receive the hops, nor did he in any way evince a willingness to comply with his contract; and he was at all times between the first day of October and the fifteenth day of November, 1913, able, ready and willing to inspect, receive, accept and pay for the hops. Part of his testimony on this subject was as follows:

"Q. You may state to the jury whether you were able, ready and willing to accept and receive and in-

spect and pay for these hops between the first day of October, 1913, and the fifteenth day of November of the same year.

"A. Yes, sir.

"Q. Pardon me.

"A. Yes, sir.

"Q. Were you on the 15th of November, 1913, ready, able and willing to inspect, receive and pay for said hops?

"A. I was. * *

"Cross-examination.

"Q. Did you have that money?

"A. I had it, yes—arrangements made for it, so as to take—I was ready, willing and able to pay for those hops at any time between the 1st of October and the 15th of November.

"Q. Where was the money?

"A. Where was the money? I presume in the bank.

"Q. What bank?

"A. Why, wherever the party to whom—with whom I had made arrangements did his banking.

"Q. What I am getting at is this, where was the coin? Now, tell me, please.

"A. Well the coin—the coin was to come from Mr. T. A. Livesley. Now, where he had that coin I do not know.

"Q. Did you have any contract with Mr. Livesley?

"A. No; I didn't.

"Q. There was no binding bargain whatever, as I understand, between Livesley and you, whereby Livesley was absolutely bound to come and give you that money?

"A. I had agreed to sell and deliver to Mr. Livesley some hops, and he was to advance me whatever money I needed at any time during the 1st of October and the 15th of November.

"By Mr. Carson: Just read that question.

"(The reporter thereupon read the question to the witness as directed by counsel.)

"A. There was; I had an agreement with Mr. Livesley.

"Q. Where is that?

"A. It was a verbal agreement.

"Q. Did you turn over this contract to him?

"A. No, sir."

"Q. Just an understanding that you would get the money from him? * *

"Redirect examination.

"Q. You state, Mr. Schucking, whether or not you had credit with Ladd & Bush at that time to the extent that you could raise 14 cents a pound at that bank on these hops?

"A. Yes, sir.

"Q. How about the market generally? Would anyone have any trouble, you or anyone else, raising 14 cents a pound on these hops at that time?

"A. No, sir.

"Q. Or at any time between the 1st of October and 15th of November?

"A. No, sir."

T. A. Livesley testified, in substance, that Schucking had sold him 20,000 pounds of hops; that he had not contracted to furnish Schucking with the money to pay for the Young hops, but that he was ready to pay him for 20,000 pounds of hops when he was prepared to deliver them; that he understood that Schucking was selling to him, relying on the Young contract to make delivery of the 20,000 pounds contracted to witness. It appeared in the testimony that hops during this time were from 22 to 24 cents a pound, and plaintiff testified that it would have been easy to raise the money at any bank on the faith of his contract for purchase of 14 cents per pound. Other matters controverted upon the appeal will appear in the opinion. The plaintiff had a verdict and judgment and defendant appeals.                    AFFIRMED.

For appellant there was a brief over the names of *Mr. Oscar Hayter* and *Messrs. Carson & Brown,* with

oral arguments by *Mr. Hayter* and *Mr. John A. Carson.*

For respondent there was a brief over the name of *Messrs. McNary, Smith & Shields,* with oral arguments by *Mr. John H. McNary* and *Mr. Roy F. Shields.*

MR. JUSTICE MCBRIDE delivered the opinion of the court.

1. Plaintiff and defendant agree that the contract, so far as the hieroglyphic, #, is concerned, is in just the same condition as it was when it was executed, and that the intent of the writing was to evidence the sale by defendant and the purchase by plaintiff of 25,000 pounds of hops. The contract is declared upon according to its legal effect, and the hieroglyphic was simply the conventional method adopted by the parties to signify pounds. So far as they were concerned, it spelled "pounds," just as effectually as though the word had been written in full in capital letters. Nobody can read the agreement and construe it any other way, and any testimony upon the subject was useless, except in so far as it tended to show the interpretation put upon it by the parties themselves. Webster defines the character, #, as signifying number. Taking this definition, we find that the unit of price is 14 cents, the unit of goods to which that price applies is a pound of hops, and the number of such units is 25,000. It is so plain that the wayfaring man, though a judge or a juryman, need not err therein. A reference to standard works on bookkeeping indicates that this hieroglyphic when placed before a figure imports "number," and when placed after a figure invariably signifies "pounds." Thus on page 121 of Sadler and

Rowe's "Business Bookkeeping and Practice," we find many entries like the following:

"Wm. E. Brady, #94 Harlem Av. 20# G. sugar at 5c.; 5# Butter at 30c.; 8# C. sugar at 5c.," etc.

The symbol is the accepted and business-like substitute for the word "pounds" when written in the above connection and following a numeral.

2. Another objection goes to the evidence of plaintiff's ability and readiness to perform and to the sufficiency of his offer to do so. The first duty of the seller was to deliver the hops at some point on cars in Oregon, he having the option as to the place of delivery, but before such delivery would be complete, plaintiff was required to inspect and receive them. Until so inspected and received, defendant was entitled to the possession of them, and when they had been inspected, received and delivered, plaintiff was bound to pay for them. The delivery and payment were to be concurrent acts, but the inspection and approval were to precede delivery and payment. Plaintiff had a right to inspect, and as the hops were in defendant's custody and no time or place was designated for the inspection, it became defendant's duty, upon demand of plaintiff, to permit such inspection and to designate a time and place where such inspection could be made. This plaintiff's evidence, which is conclusive upon this court after verdict, shows was refused by defendant, and thereby the contract was broken. It is shown that plaintiff made a written demand on defendant that he be permitted to inspect and receive the hops mentioned in the contract, such inspection and receiving to be at any convenient place which defendant might designate, and that defendant notify plaintiff of the time and place where such inspection could be had and the hops received; and in the same communication

he notified defendant that upon such inspection he would pay him the full purchase price of the hops, amounting to $3,500. Defendant wholly ignored this demand, and this, under the circumstances, amounted to a refusal.

3. It further appears from plaintiff's testimony that upon the 8th of November, 1913, plaintiff said to defendant: "Eph, it is getting pretty late. Can you tell me when you are going to be ready to deliver so that I will be there?" and that defendant answered: "I am not going to deliver. You don't think that contract of yours is any good?"—to which plaintiff replied, "I most certainly do." Whereupon defendant answered, "Well it is not." Accepting this testimony as true, as we must after verdict, plaintiff has shown a compliance with every condition of his contract so far as defendant's conduct has permitted him to do so, and has disclosed a good right to recover unless he has failed to show his ability to have paid for the hops had defendant complied with his part of the contract; it being the settled law of this state that a declaration by one party to a contract made prior to the time fixed for the performance that he will not comply with such contract, if not withdrawn, may dispense with or excuse an offer to perform by the other party before bringing the action, although it does not ordinarily excuse ability to perform: *Longfellow* v. *Huffman,* 49 Or. 486 (90 Pac. 907); *Krebs Hop Co.* v. *Livesley,* 55 Or. 227 (104 Pac. 3).

4. This brings us to the question whether there was evidence sufficient to go to the jury tending to show that plaintiff if his offer to inspect and receive the hops had been accepted, would have been able to pay the $3,500 required by his contract. The testimony indicates that he did not, at the time of the demand

upon defendant, have that amount of money in the bank or in his possession, but it also appears that if defendant had accepted his offer Mr. Livesley had agreed to take 20,000 pounds of the hops and to advance the money to pay for them, which would háve been sufficient to have enabled plaintiff to pay defendant. It is also in evidence that hops were then bringing from 22 to 24 cents a pound, and that plaintiff could easily have raised the money upon a contract which called for a payment at the rate of only 14 cents a pound. The question of his ability to have paid the purchase price was one of fact for the jury, and we think upon the whole testimony there is no doubt that, if the defendant had been willing to comply with his part of the agreement, his money would have been ready.. That this is sufficient is, we think, shown by *Ladd & Tilton* v. *Mason,* 10 Or. 308; *Catlin* v. *Jones,* 52 Or. 337 (97 Pac. 546) ; *James Higgins Co.* v. *Torvick,* 55 Or. 274 (106 Pac. 22).

5. We will now consider *seriatim* the points urged in defendant's brief. The first point relates to the failure of plaintiff to prove compliance with Chapter 154, Laws of 1913, relating to firm names, etc. The complaint alleged full compliance with the act, and this allegation was expressly admitted in the answer. Notwithstanding this admission, defendant now insists that under the provisions of Section 5 of the act referred to plaintiff should have introduced evidence to sustain the allegation; said section being as follows:

"No person or persons carrying on, conducting or transacting business as aforesaid, or having any interest therein, shall hereafter be entitled to maintain any suit or action in any of the courts of this state without alleging and proving that such person or persons have filed a certificate as provided for in Section 1, and fail-

ure to file such certificate shall be *prima facie* evidence of fraud in securing credit.''

We do not think that it was the intention of the legislature to alter the rules of evidence to such an extent as to require a party to introduce evidence of a fact already admitted by his adversary. While admissions in the pleadings are generally spoken of as dispensing with evidence of the facts so admitted, they are really conclusive evidence of such facts: 1 R. C. L. 469. In *Beamish* v. *Noon,* 76 Or. 415 (149 Pac. 522), we held that the objection that the complaint failed to allege that the certificate required by the act had been filed was waived by a failure to demur or plead in abatement, and that decision is conclusive here.

Points 2, 3, 4, 6, 8 and 9 are already covered by our preceding discussion and need not be further considered.

6. By point 5 it is urged the agreement introduced by plaintiff is void for uncertainty and repugnance and does not prove the allegation of B. O. Schucking as buyer against E. M. Young as seller. By admitting the first paragraph, it is conceded by defendant that plaintiff was doing business as Schucking & Co., in effect that Schucking & Co. was in fact B. O. Schucking. It is alleged in paragraph 2 that the contract was entered into with B. O. Schucking & Co., which taken in connection with the first allegation is substantially an allegation that it was entered into with plaintiff. There is no such variance between the pleadings and proof as could possibly have misled defendant to his prejudice, and this is what a variance must do to enable a party to take advantage of it: Section 97, L. O. L.

7. Point 6 relates to alterations in the written agreement. It is claimed that the alterations and erasures

were not explained before the agreement was received in evidence. This is evidently a mistake. Upon page 3 of the transcript of evidence we find, after plaintiff had testified respecting the making and signing of the document, his attention was called to the interlineations and erasures, whereupon he testified that they were made before the agreement was signed. Counsel then proceeded to interrogate him as to the meaning of the sign, #, following the figures, "25,000," when counsel for defendant interposed an objection to this line of examination, which after argument was overruled by the court. Thereafter the examination was continued in reference to the custom of hop buyers in the use of this hieroglyphic (which testimony we hold was immaterial, but harmless), and counsel for plaintiff offered the agreement in evidence.

8. Before it was admitted counsel for defendant obtained leave to cross-examine further, and handed plaintiff a duplicate in which the interlineations did not appear. Plaintiff then testified, in substance, that the two were written at the same time and with the same impression of the pencil, there being a carbon paper between the sheets of paper, and that both were signed at once, the pencil making an impression on the second sheet. In answer to an interrogatory by his counsel he then made the following explanation:

"A. I stated—when you asked me, I said that all those interlineations and erasures had been made before the contract had been signed. That was true, with one exception. You will notice in the duplicate copy the word 'prime' shows. After it was written and signed Mr. Young objected to the word 'prime.' He said he wouldn't specify or hold himself to any one particular quality, but he would deliver a merchantable hop, good average hop, and so, thinking Mr. Young couldn't attempt to deliver anything but what was a merchantable hop—

"By Mr. Carson: Just a minute—
"By Mr. McNary: Just tell what happened.
"A. So, at his suggestion and his desire I crossed out the word 'prime' on mine.   This was after the contract had been signed.
"Q. Was that the only change?
"A. That was the only change; yes, sir."

This testimony was technically sufficient to justify the admission of the document.

9. It is true that after it had been admitted and during his examination on rebuttal he made a correction by stating that the figures, "1913," following the erasure of the word "prime" were written at the same time that the word "prime" was erased, but this correction does not alter the fact that when the document was admitted there was before the court evidence to justify the ruling admitting it.   The testimony given upon rebuttal would have had the same effect had it been given upon the direct case, so that its introduction did not alter the status of the document in any respect.

Tested by the views above expressed we are of opinion that there was a fair trial in the court below, that the instructions given fully and fairly stated the law, and that the record discloses no reversible error.

The judgment is affirmed.              AFFIRMED.

MR. CHIEF JUSTICE MOORE, MR. JUSTICE BENSON and MR. JUSTICE HARRIS concur.