Argued and submitted November 15, 1995, reversed and remanded March 20, petition for review allowed August 13, 1996 (324 Or 78)

Reverend Ion Petru VOIN
and Florica Voin, husband and wife,
*Respondents,*

*v.*

Eugen SZABO
and Flory Szabo, husband and wife,
*Appellants.*

(9407-04798; CA A86744)

913 P2d 717

Andrew P. Ositis argued the cause and filed the brief for appellants.

Carol Wright argued the cause for respondents. With her on the brief was Alex Christy.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

LANDAU, J.

Riggs, P. J., dissenting.

## LANDAU, J.

Plaintiffs initiated this action to compel specific performance of an earnest money agreement for the purchase of a residence. The trial court granted plaintiffs the relief they requested, and defendants appeal. On *de novo* review, ORS 19.125, we reverse and remand.

Although the negotiations between the parties were extended and complex, the facts relevant to the disposition of the appeal are straightforward. Defendants owned a home in Portland in which they resided and operated a licensed adult foster care business. They decided to sell their home in late 1993. Plaintiffs were interested in purchasing the home and, perhaps, the business as well. On April 1, 1994, the parties executed an earnest money agreement. The agreed price was $145,000, with $1,000 down, $28,000 at or before closing and the balance of $116,000 at closing. The agreement required the parties to close the sale on or before July 1, 1994.

Plaintiffs later paid defendants $10,000. Next, they consulted with a mortgage broker to obtain financing. The broker told plaintiffs that they would qualify for a maximum loan of 80 percent of the presumed $145,000 value of the house, that is, $116,000, if they could pay $10,000 down and if defendants would carry a second mortgage of $5,000. Meanwhile, plaintiffs sold their own home, moved into defendants' residence and began paying rent to them.

On June 2, 1994, the mortgage broker received an appraisal for the house at $130,000. That meant that the maximum loan amount could be only $104,000, not the $116,000 the parties expected. Plaintiffs decided to proceed with the purchase anyway, based on their expectation that they would obtain enough money from the sale of their own house to make up the difference.

At that point, a dispute ensued over whether the $145,000 purchase price included the sale of the adult foster care business that defendants had been operating in their home. Defendants contended that plaintiffs owed them an additional $15,000 for the sale of the business,

while plaintiffs insisted that the sale price of $145,000 included the business.

On July 12, 1994, after the deadline for closing, plaintiffs initiated this action for specific performance. Defendants answered, alleging as affirmative defenses the failure of plaintiffs to pay either the $28,000 or the $116,000 amounts required under the earnest money agreement. The trial court found that defendants had repudiated the earnest money agreement and that, but for the repudiation, plaintiffs were ready, willing and able to pay the $28,000 and $116,000 payments by the closing date. The court ordered defendants to sell their home for $145,000 and ordered plaintiffs to pay defendants $1,300 per month for the longer of six months or until they no longer operate the business to compensate them for the business.

On appeal, defendants argue that the trial court erred in finding that they had repudiated the earnest money agreement and that plaintiffs were ready, willing and able to perform. There is, argue defendants, no evidence to support either finding. Plaintiffs argue that, by insisting on an additional $15,000 to close the transation, defendants effectively repudiated the earnest money agreement. They also argue that there is, in fact, evidence of their readiness, willingness and ability to perform. They point to the testimony of their mortgage broker, who testified at trial that, after learning that plaintiffs had approximately $31,000 in various savings accounts, he was of the opinion that they "would have qualified for a loan, yes. It would have been very close." Plaintiffs rely on no other evidence to establish that they were ready, willing and able to perform.

■ We assume, without deciding, that defendants repudiated the earnest money agreement. We nevertheless conclude, on *de novo* review, that plaintiffs failed to demonstrate that they were ready, willing and able to perform the earnest money agreement.

■■ A party seeking the remedy of specific performance must establish

"not only that he has a valid, legally enforceable contract, but also that he has complied with its terms by performing or offering to perform on his part the acts which formed the consideration of the undertaking on the part of the defendant, or that he is ready, able, and willing to perform his obligations under the contract[.]"

*Percy v. Miller et al.*, 197 Or 230, 239-40, 251 P2d 463 (1953). Actual tender of performance may be excused if the defendant has repudiated the contract, but the plaintiff still must establish that he or she was ready, willing and able to perform. *Aurora Aviation v. AAR Western Skyways*, 75 Or App 598, 604, 707 P2d 631 (1985); *Cook v. Desler*, 52 Or App 5, 13, 627 P2d 885, *rev den* 291 Or 368 (1981).[1]

■ To establish that a party is ready, willing and able to perform, more is required than speculation that, but for a defendant's repudiation, a contract *might have been* performed. In *Aurora Aviation*, for example, the plaintiff contracted to purchase an airplane for $115,000. It was able to secure $95,000 but had difficulty coming up with the $20,000 balance. The defendant sold the plane to a third party. The plaintiff then sued for breach of contract and was awarded damages. The defendant appealed, arguing that there was no evidence that the plaintiff had been ready, willing and able to pay the entire $115,000. The plaintiff argued that there was evidence that, but for the sale to the third party, it would have obtained the remaining $20,000 from an anticipated sale of the plane to another party. We rejected that argument and reversed because

"the record is devoid of any showing that plaintiff was either *able* to pay the $20,000 balance or that the amount was *available* to be paid to defendant."

*Aurora Aviation*, 75 Or App at 605 (emphasis in original).

---

[1] The dissent argues that *Aurora Aviation* is distinguishable, because plaintiffs' inability to perform in this case was caused by defendants' repudiation. In support of its contention, the dissent relies on *Benedict v. Harris*, 158 Or 613, 77 P2d 442 (1938), and *Schucking v. Young*, 78 Or 483, 153 P 803 (1915). A review of those cases, however, discloses that the dissent confuses excusing actual tender of performance with excusing proof that a party is ready, willing and able to perform. Both *Benedict* and *Schucking* speak to the former and say nothing about the latter. As *Aurora Aviation* and the other authorities we have cited bear out, repudiation excuses tender, but it does not excuse proof that one was ready, willing and able to perform.

In this case, there is no evidence that plaintiffs were able to pay either the $160,000 that defendants argue was due under the earnest money agreement or the lesser amount of $145,000 that plaintiffs argue was owing. The evidence shows that plaintiffs had paid defendants $11,000 and that they had cash in several savings accounts totaling approximately $31,000. They had consulted with a mortgage broker about obtaining a $104,000 loan for the balance, but they never actually obtained the financing. Indeed, the best the broker could say on behalf of plaintiffs was that he believed that they "would have qualified for a loan, yes. It would have been very close." There is no evidence that the mortgage broker or anyone else obtained credit reports on either plaintiff. There is no evidence that any particular financial institution had made a commitment to provide financing and that plaintiffs, in fact, had funds available to them. There is only evidence that, at least in the view of the broker, they had sufficient funds to go forward with the process of obtaining financing.[2]

Thus, as in *Aurora Aviation*, there is no evidence that plaintiffs were *able* to pay defendants the $104,000 balance or that the funds even were *available* to them. There is only the speculation of the broker that plaintiffs probably would have been able to pay. Particularly in the light of the fact that the financing was, in the words of plaintiffs' own broker, "very close," it is difficult for us to understand how the mere possibility of obtaining financing from a hypothetical lender satisfies the requirement that plaintiffs actually are able to pay the money owed. We conclude that plaintiffs failed to establish an essential

---

[2] The dissent takes us to task for insisting on more proof than the testimony of the broker that plaintiffs had sufficient funds to seek financing. According to the dissent, that would require the fruitless expenditure of some $5,913. The dissent is mistaken. There is no evidence that establishing that funds were, in fact, available would have cost plaintiffs $5,913. That figure is drawn from the mortgage broker's estimate of closing costs, which were to be paid only if the transaction actually closed. Indeed, the figure includes property tax impounds, hazard insurance impounds, mortgage insurance premiums, interim interest, title insurance fees, transfer fees, settlement fees, tax related service fees, recording fees and document delivery fees, none of which plaintiffs would be required to pay simply to demonstrate that they were ready, willing and able to obtain financing.

prerequisite to obtaining the extraordinary remedy of specific performance, and the trial court erred in reaching a contrary conclusion.

Reversed and remanded.

**RIGGS, P. J.,** dissenting.

I agree with the majority as to the scope of review. My disagreement with the majority focuses on one narrow fact issue: whether plaintiffs were *able* to perform their duties under the earnest money agreement. As I view the record, plaintiffs have shown by a preponderance of the evidence that, but for defendants' last minute repudiation of the contract, they were able to perform their obligation under the earnest money agreement.

It is necessary for the purpose of my discussion to describe in somewhat greater detail the facts surrounding the alleged repudiation by defendants. When, in January 1994, plaintiffs entered into their first earnest money agreement with defendants for the purchase of the house, they paid $1,000 down, and agreed to pay an additional $14,000 down on the date of closing. Plaintiffs also executed a $14,000 note to defendants, drafted by defendants and entitled, "Agreement for terms on the note the seller is carrying." By the note's terms, plaintiffs were to pay defendants $14,000, with a payment of $10,000 due on or before February 24, and the balance paid over a 12-month period beginning April 1, 1994. The note stated that defendants were making a loan to plaintiffs and that the loan was secured by a mortgage on the real property. On March 3, 1994, plaintiffs made a payment of $3,000 on the note.

On April 1, 1994, the scheduled closing date, the parties abandoned the first earnest money agreement. In its place, they executed a second earnest money agreement with essentially the same terms as the first, except that it required a down payment of $28,000 on or before the closing date, July 1, 1994.

Plaintiffs made an additional $7,000 payment on the promissory note on April 30, 1994. On May 1, 1994, plaintiffs moved into the house as tenants. On May 2, 1994,

at defendants' request, plaintiffs executed a second promissory note with the same terms as the first, except that the amount of the "loan" was stated to be $15,000. The parties appear to agree that the second note was to take the place of the first. By that time, plaintiffs had paid defendants $11,000, including the $1,000 earnest money and $10,000 toward the note. The amount owing on the note was $5,000 on the date plaintiffs last met with the mortgage broker concerning financing. He gave them a breakdown of their projected costs of the loan in the light of an appraisal showing that the house had a value of only $130,000.

The dispute in this case arose over the parties' conflicting views of the purpose of the note. After their meeting with the mortgage broker, plaintiffs met with defendants to describe the intended financing. In their discussions with the broker, plaintiffs had assumed that the $15,000 note had reduced the balance owing on the purchase price, and the financing had been planned accordingly. Defendants rejected that view, insisting that the note represented a separate and additional obligation for the foster care business. They refused to close the transaction if the note was regarded as a part of the real estate transaction.

Plaintiffs' evidence at trial supports the finding that the note was intended to represent a loan on a portion of the down payment for the home. Defendants put on testimony intended to show that the note represents a "loan" to plaintiffs of a foster care business that plaintiffs would operate in the home from the date that they moved in as tenants on May 1, 1994, until closing on July 1. The note itself makes no mention of its purpose and neither do either of the earnest money agreements. The trial court concluded that the note was intended to reflect the amount of the purchase price that defendants were financing. The trial court's view is amply supported by the evidence and, on *de novo* review, I would reach that same conclusion.

The mortgage broker testified at trial that, assuming that plaintiffs had paid defendants $11,000 toward the purchase price of the house and that defendants were willing to carry a second loan of $5,000, plaintiffs would have

been approved for financing, "[they] *would* have qualified for the loan." (Emphasis supplied.) If, as did the trial court and as have I, we accept plaintiffs' evidence that the purpose of the note was to reflect the amount of the purchase price that defendants had agreed to finance, then plaintiffs satisfied each of the conditions necessary to obtain approval of their loan application. There is no contradictory evidence on that point. The only contention made by defendants concerning plaintiffs' ability to perform their obligation under the earnest money agreement is that they were "unable" to do so because they had not yet *obtained* financing; *i.e.*, approval by a lending institution. The majority accepts that rationale despite the fact that the evidence shows that it was defendants' own repudiation that prevented plaintiffs from completing the financing process. The majority would require plaintiffs to undertake the fruitless effort of pursuing their application for financing, with its inherent significant costs,[1] despite their knowledge that defendants had repudiated the agreement and were insisting on additional amounts never agreed to. I think that under the circumstances of this case, where the repudiation arises out of a dispute over the purchase price, the majority places an unfair burden on the party seeking specific performance. I would hold that plaintiffs satisfied their burden to show, by a preponderance of the evidence, that they were able to perform the earnest money agreement *under the terms they had agreed to* when they provided uncontroverted evidence that, but for defendants' repudiation by insisting that plaintiffs pay more, they could have obtained financing for the agreed-upon sale price.

The case on which the majority relies, *Aurora Aviation v. AAR Western Skyways*, 75 Or App 598, 604, 707 P2d 631 (1985), is distinguishable. There, the plaintiff, who was seeking damages for breach of a contract to sell an airplane, had been unable to obtain financing for the full purchase price but anticipated obtaining the funds after resale of the plane to a third party. We said that the plaintiff could not sue for breach of contract because he had not shown that the amount owing on the contract was available to pay the defendant. Here, plaintiffs have shown that, more probably

---

[1] Estimated closing and prepaid escrow costs were $5,913.

than not, *but for the repudiation* resulting from defendants' insistence on a higher purchase price, the money necessary to satisfy plaintiffs' obligation under the contract was available. That is all that is required. *Benedict v. Harris*, 158 Or 613, 623, 77 P2d 442 (1938); *Shucking v. Young*, 78 Or 483, 493, 153 P 803 (1915).

I dissent.