Argued and submitted March 17, on appeal, reversed and remanded with
instructions to reinstate the jury's verdict; affirmed on cross-appeal
August 2, 2006, petition for review allowed January 23, 2007 (342 Or 299)

Lillian R. LOGAN,
*Appellant - Cross-Respondent,*

*v.*

D. W. SIVERS CO.,
an Oregon corporation,
*Respondent - Cross-Appellant.*

C031283CV; A125412

141 P3d 589

James E. Mountain, Jr., argued the cause for appellant - cross-respondent. With him on the briefs were Adina Matasaru, Jona J. Maukonen, and Harrang Long Gary Rudnick PC.

Michael B. Merchant argued the cause for respondent - cross-appellant. With him on the briefs were James M. Baumgartner, Margaret E. Schroeder, and Black Helterline LLP.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum,* Judges.

ROSENBLUM, J.

---

\* Rosenblum, J., *vice* Schuman, J.

## ROSENBLUM, J.

This case involves the enforceability of a "nonshop" provision contained in a letter of intent to enter into a final purchase and sale agreement for real property. In the "nonshop" provision, defendant, the seller, promised not to solicit other offers or contract to sell the property to a third party for a period of 60 days. The property at issue was a shopping mall that plaintiff intended to buy as part of a section 1031 exchange[1] to avoid tax liability from her previous sale of a different property. Twenty-one days after the parties executed the letter of intent, defendant entered into a sale agreement with a third party.

Plaintiff brought this action for breach of contract against defendant, seeking expectation damages as well as consequential damages arising from plaintiff's tax liability. A jury awarded plaintiff the consequential tax losses but not the expectation damages. The trial court entered judgment notwithstanding the verdict (JNOV) on the grounds that the letter of intent was not an enforceable agreement and that, even if it was, the claimed damages were unavailable as a matter of law. We reverse.

We state the facts in the light most favorable to plaintiff and draw all reasonable inferences in her favor. *Bennett v. Farmers Ins. Co.*, 332 Or 138, 142, 26 P3d 785 (2001). In early 2003, plaintiff sold a substantial piece of real property for $3.9 million. To defer recognition of her gain on that property, plaintiff began looking for other investment property that she could purchase to effect a section 1031 exchange. Plaintiff had 45 days from the sale of the original property to identify a replacement property and an additional 180 days to purchase the replacement property. 26 USC § 1031(3). To that end, plaintiff began negotiations

---

[1] The term "1031 exchange" refers to 26 USC section 1031(a)(1), which provides:

"No gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment."

with defendant to purchase a shopping mall known as Barnes Miller Village.

Plaintiff's broker approached defendant's president about purchasing the property. The broker told defendant's president that plaintiff was a "motivated 1031 buyer." Defendant's president testified that he understood the term "1031 buyer" to mean someone who has already sold property and is looking for replacement property that can be acquired within section 1031's strict timelines. He testified that he had participated in approximately 80 property transactions since 1985 that involved section 1031 exchanges and, consequently, was familiar with the rules and timelines governing those exchanges.

After several days of negotiations, the parties entered into a letter of intent in which they identified (1) the property to be purchased, (2) a purchase price of $5.28 million, and (3) a closing date of June 30, 2003—three and one-half months from the date they signed the letter of intent and one month before plaintiff's window for the section 1031 exchange would close. They also set out a schedule in the letter of intent for moving toward a final purchase and sale agreement. Under a heading entitled "Conditions of Purchase," the parties agreed to the following:

"1. A fully executed Purchase and Sale Agreement within approximately fifteen (15) days of signature by both parties of this Letter of Intent; Purchaser shall provide the initial draft of the Purchase and Sale Agreement.

"2. Approval by Purchaser of all aspects of the Property after a thirty (30) day review period of all documents related to the Property, including review of the condition of the Property, review of title matters and all other due diligence deemed appropriate by Purchaser. Seller to provide copies of all documents related to the Property to Purchaser within five (5) days of execution of the Purchase & Sale Agreement.

"3. Approval of Purchaser of financing within sixty (60) days from approval of the review period."

In addition to the above terms, the letter of intent also contained a "nonshop" provision. Under the heading "Non-Solicitation," the provision stated:

"Seller and/or its representatives agree that it will not seek nor enter into a letter of intent or purchase agreement for sale of the Property with any third party for a period of sixty (60) days from the date this Letter of Intent is signed by both parties and becomes effective."

Another paragraph in the letter of intent explained that the parties did not intend to be bound by the terms proposed for the final purchase of the property—that is, the price and closing date terms—but did intend to be bound by some of the other terms laid out in the letter of intent. That paragraph provided:

"Seller and Purchaser acknowledge that this Letter of Intent proposal is not a binding agreement and that it is intended solely to establish the principal terms of the purchase and as a basis for the preparation of a binding Purchase and Sale Agreement. The Purchase and Sale Agreement shall be subject to Seller's and Purchaser's approvals and approval by their respective counsel, and only a fully executed Purchase and Sale Agreement shall constitute a binding transaction and binding obligations between the parties; provided, however, that in consideration of Purchaser's good faith efforts to review the due diligence material provided by Seller, Seller agrees to be bound to provide the required due diligence documents to Purchaser within the time required and to comply with the Non-Solicitation provision set forth above."

The parties signed the letter of intent on March 14, 2003. Plaintiff delivered the draft purchase and sale agreement 21 days later—on April 4. There were a number of reasons for the delay that we need not discuss here. It suffices to say that plaintiff delivered the draft agreement in time for the parties to meet the closing date contemplated in the letter of intent and that plaintiff kept defendant apprised of the progress of the draft agreement: during the three weeks between the signing of the letter of intent and delivery of the draft purchase and sale agreement, plaintiff's broker had approximately six conversations with defendant's officers in which he updated them on the progress of the draft agreement and requested documents relating to the property. At no point did defendant object to the fact that the draft had not yet been delivered. However, by the time plaintiff did deliver the draft agreement, defendant had already contracted to sell

Barnes Miller Village to another party. Plaintiff was unable to purchase another replacement investment property in time to effect a section 1031 exchange and thus was required to pay $919,605 in taxes on the gain that she realized from the property she sold.

Plaintiff brought this action seeking both expectation damages—measured by the difference between the price set out in the letter of intent and the sale price to the third party—as well as consequential damages in the form of her tax liability. In addition to adducing evidence of the facts just recounted, plaintiff also introduced testimony from her mortgage broker, who stated that plaintiff would have "most definitely" been financially able to obtain financing for the property.[2]

At the close of plaintiff's case-in-chief, defendant moved for a directed verdict on the following grounds: (1) no part of the letter of intent constituted an enforceable agreement because it was merely an "agreement to agree"; (2) even if the "nonshop" provision was enforceable, defendant's breach of it was excused because plaintiff failed to timely deliver a draft of the purchase and sale agreement; (3) even if defendant's breach was not excused, plaintiff could not recover the damages she sought; and (4) plaintiff failed to present sufficient evidence that she was able to obtain financing for the sale.

The trial court agreed with defendant's first and third grounds for a directed verdict. Nevertheless, the court submitted the case to the jury in accordance with ORCP 63 B, which provides:

> "In any case where, in the opinion of the court, a motion for a directed verdict ought to be granted, it may nevertheless, at the request of the adverse party, submit the case to the jury with leave to the moving party to move for judgment in such party's favor if the verdict is otherwise than as would have been directed or if the jury cannot agree on a verdict."

---

[2] Plaintiff also adduced extensive evidence about her attempts to mitigate her damages. We do not discuss that evidence further because defendant makes no argument regarding mitigation on appeal.

The jury returned a verdict for plaintiff, awarding her $919,652—virtually the exact amount of her tax liability. Notwithstanding the verdict, the trial court entered judgment for defendant pursuant to ORCP 63 B. Plaintiff appeals and seeks reinstatement of the jury's verdict. She argues that, contrary to the trial court's conclusion, the contract was enforceable, it could give rise to a claim for consequential damages of the type that the jury awarded here, and there is evidence in the record to support the jury's award of damages. Defendant disagrees and, in addition, asserts that, even if the trial court incorrectly set aside the verdict on those grounds, we should nevertheless affirm on the alternate grounds advanced in defendant's directed verdict motion.[3]

■    We begin with whether there was an enforceable agreement. Whether a contract exists is a question of law, and we review the trial court's determination that there was not an enforceable agreement in this case for legal error. *Ken Hood Construction v. Pacific Coast Construction*, 201 Or App 568, 577, 120 P3d 6 (2005). Defendant argues that there was not an enforceable agreement here because the parties expressly stated that they did not intend to be bound by a purchase and sale agreement. Plaintiff counters that the parties did express their intent to be bound by the "nonshop" provision and the provisions to supply and review the due diligence documents. According to plaintiff, those provisions constituted an enforceable agreement to negotiate on those terms, and it is that agreement to negotiate that plaintiff is seeking to enforce. Defendant responds that such an agreement to negotiate is unenforceable as a matter of law.

In examining the enforceability of preliminary agreements, some courts and commentators have found it helpful to distinguish between different types of preliminary agreements. *See* E. Allan Farnsworth, *Farnsworth on Contracts* § 3.26b (1990) (discussing categories and compiling cases). Courts have identified four main types of preliminary agreements. The first has been dubbed a *"Tribune* Type I,"* after *Teachers Ins. and Annuity Ass'n v. Tribune Co.*, 670 F Supp 491 (SDNY 1987). The *Tribune* court described its

---

[3] Defendant raises those issues in a cross-appeal. We consider them, rather, as alternative bases for affirmance.

Type I agreement as one in which "the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation" but also contemplate that they will set out their agreement in a formal writing. *Id.* at 498. The second type of agreement, called an "agreement with open terms," is one in which the parties agree to be bound by some terms but leave others open for the court to fill in. *Farnsworth on Contracts* § 3.26b (1990). The third type of agreement is a *"Tribune* Type II" agreement, or an "agreement to negotiate." Such an agreement imposes a duty to negotiate on certain terms specified by the parties, such as to negotiate in good faith. If negotiations fail, however, there will be no final contract. *Id.* The fourth type of agreement is the proverbial "agreement to agree," in which the parties do no more than express a desire to complete negotiations.

The agreement at issue in this case is of the third type. It purports to bind the parties to certain negotiation terms specified in the agreement, specifically, the "nonshop" provision and the requirement that defendant deliver and plaintiff review due diligence materials. Thus, it is a *"Tribune* Type II" agreement or "agreement to negotiate."

Oregon is one of the few jurisdictions that has not yet addressed the enforceability of agreements to negotiate. Oregon courts have, however, addressed the enforceability of other types of preliminary agreements and concluded that they are enforceable if the parties manifest an intent to be bound by them, if their terms are sufficiently definite, and if they meet the other prerequisites for an enforceable contract. *See Ken Hood Construction Co.,* 201 Or App at 579 (where parties manifested an intent to be bound by oral agreement, which contained all the material terms of the contract, agreement was an enforceable *Tribune* Type I agreement, even though parties anticipated reducing their agreement to writing but never actually did); *see also Edwards v. Tobin et al.,* 132 Or 38, 43, 284 P 562 (1930) (where parties manifested an intent to be bound, but left open a material term for future negotiation, agreement could still be enforced as agreement with open terms where the parties specified a canon or method by which the missing term could be supplied by the court). On the other hand, if the parties merely express a

desire to complete negotiations—as opposed to expressing their intent to negotiate on certain specified terms—or if the terms of the agreement are too indefinite, then such agreements are dubbed "agreements to agree" and are unenforceable. *Slayter v. Pasley*, 199 Or 616, 627-28, 264 P2d 444 (1953); *see also Neiss v. Ehlers*, 135 Or App 218, 222, 229, 899 P2d 700 (1995) (provision was deemed unenforceable "agreement to agree," but reliance damages were recoverable under it).

Courts in other jurisdictions have used those same guideposts—definiteness and intent to be bound—in evaluating the enforceability of agreements to negotiate on certain terms, which is the type of preliminary agreement at issue in this case. Such agreements have come before other courts with increasing frequency, but with mixed results. *Farnsworth on Contracts* § 3.26b. The traditional view is that the parties to such an agreement do no more than express a desire to complete the negotiations and, thus, such agreements are merely agreements to agree and are not enforceable. *Cinelli v. Ward*, 997 SW2d 474, 478 (Ky App 1998) (noting that "some jurisdictions recognize such agreements to negotiate in good faith and have imposed a measure of damages for a party's failure to so negotiate," but that Kentucky "seem[s] to take the traditional 'all or nothing' approach: Either the agreement is enforceable as a binding contract to consummate the transaction or it is unenforceable as something less" (footnote omitted)).

Increasingly, however, courts in other jurisdictions have rejected a blanket rule against enforcement where the parties express their intent to be bound by the agreement. One court explained that the parties may have good reasons for wanting to be bound by specific terms governing a lengthy and complex negotiation process. The court observed, "There is commercial utility to allowing persons to hug before they marry." *Goren v. Royal Investments Inc.*, 25 Mass App Ct 137, 142, 516 NE2d 173 (1987). In citing the importance of respecting the parties' express intent, another court stated that "[p]ersons are free to contract to do just about anything that is not illegal or immoral. Conducting negotiations to buy and sell ice cream is neither." *Copeland v. Baskin Robbins USA*, 96 Cal App 4th 1251, 1257, 117 Cal Rpt 2d 875 (2002) (footnote omitted). Thus, the majority of jurisdictions now

hold that agreements to negotiate are enforceable where the intent to be bound is manifest. *See id.* at 1259 ("Most jurisdictions which have considered the question have concluded a cause of action will lie for breach of a contract to negotiate the terms of an agreement."); *see generally* E. Allen Farnsworth, *Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations*, 87 Colum L Rev 217 (1987) (compiling cases).

Even where parties expressly state their intent to be bound by an agreement to negotiate, some courts have refused to enforce such agreements on indefiniteness grounds. There are two primary arguments as to why agreements to negotiate are too indefinite to be enforced. The first is that it is too difficult to determine what the obligation to negotiate consists of—in other words, too difficult to determine what would constitute a breach. *See, e.g., Pinnacle Books, Inc. v. Harlequin Enterprises*, 519 F Supp 118, 121 (SDNY 1981) (holding that a clause requiring parties to use their "best efforts" to reach an agreement was too vague to be enforced because there is no clear set of guidelines against which the parties' "best efforts" may be measured). The second argument is that it is too difficult to calculate the damages caused by a breach. *See, e.g., Ohio Calculating, Inc. v. CPT Corp.*, 846 F2d 497, 501-02 (8th Cir 1988) (holding that agreements to negotiate in good faith are unenforceable in part because they do not provide a basis for fashioning an appropriate remedy).

With respect to the latter argument—that calculating damages is too difficult—courts following the modern trend, again, do not see the indefiniteness problem as justifying a complete bar to enforcement of agreements to negotiate. Chief Judge Posner, writing for the Seventh Circuit Court of Appeals, has stated that, although it may, in some cases, be difficult to prove damages with sufficient specificity, that problem "goes to the practicality of the remedy, not the principle of it." *Venture Associates v. Zenith Data Systems*, 96 F3d 275, 279 (7th Cir 1996). If the plaintiff can prove that, but for the defendant's breach, the parties would have entered into a final contract, then the loss of the benefit of the contract is a consequence of the defendant's bad faith and,

provided that it is a foreseeable consequence, the defendant is liable for that loss. *Id.*

Moreover, even if expectation damages are not available in a particular case, other remedies may be. For example, specific performance may be available in some cases, *see Channel Home Centers, Grace Retail v. Grossman,* 795 F2d 291 (3rd Cir 1986) (indicating availability of that remedy), as may be incidental damages for out-of-pocket expenses incurred in the negotiation, *see Neiss,* 135 Or App at 221, 229 (such damages available under a reliance theory), or consequential damages arising from lost opportunities, *see* Farnsworth, 87 Colum L Rev at 225-29 (advocating recovery for such expenses). Since a variety of alternative remedies may be available to suit the particular circumstances of a case, we reject the view that agreements to negotiate, by their nature, do not provide a sufficient basis for fashioning an appropriate remedy.

■ With respect to the first argument—that it is too difficult to determine what would constitute a breach—we acknowledge that, in some cases, the difficulty may be insurmountable. However, we do not see that as a reason to impose a blanket rule barring enforcement of all agreements to negotiate. Rather, a better approach is to consider such agreements on a case-by-case basis and determine whether, as with any other ostensible contract, the terms of the agreement manifest an intent by the parties to be bound by the agreement and whether the terms are sufficiently definite to provide a basis for determining whether a breach has occurred. Keeping in mind the two fundamental requirements of intent to be bound and definiteness, we turn to the agreement in this case.

■ Here, the parties expressly manifested their intent to be bound by certain terms governing the negotiation. The key provision in the letter of intent provides, "*Seller agrees to be bound* to provide the required due diligence documents to Purchaser within the time required and to comply with the Non-Solicitation Provision set forth above." (Emphasis added.) Thus, this is not a case in which the parties did not intend to be bound by any portion of the preliminary agreement until there was a final written one, or one in which the

court is asked to imply an agreement where none was apparent. Here, the parties manifested an intent to be bound by certain terms that would govern their negotiations. We see no reason to disregard that expressed intent. Thus, the agreement to negotiate is enforceable if its terms are sufficiently definite.

We conclude that they are. The letter of intent states that defendant "will not seek nor enter into a letter of intent or purchase agreement for sale of the Property with any third party for a period of sixty (60) days from the date this letter of intent is signed by both parties and becomes effective." That provision is sufficiently definite to allow a court to determine whether there has been a breach. The "nonshop" provision is precise: defendant was not to enter into a letter of intent or purchase and sale agreement with a third party for at least 60 days. A breach of that provision is easily ascertainable.

■ Similarly, a breach of defendant's obligation to provide, or of plaintiff's obligation to review, the due diligence materials is easily ascertainable. We are not dissuaded from that conclusion by the words "good faith efforts" that qualify plaintiff's obligation to review the materials. All contracts include an implied covenant of good faith and fair dealing. *Zygar v. Johnson*, 169 Or App 638, 645, 10 P3d 326 (2000), *rev den*, 331 Or 584 (2001). The fact that this agreement expressly stated that plaintiff would make "good faith efforts to review the due diligence materials" does not make plaintiff's obligation illusory or indefinite.

Nor does the fact that the agreement called for plaintiff to deliver the draft within "approximately" 15 days render the agreement too indefinite to be enforced. Although the word "approximately" is vague, it fell to the jury to determine what constituted a reasonable amount of time for plaintiff to satisfy her obligation to produce a draft agreement. *See Pacific First Bank v. New Morgan Park Corp.*, 319 Or 342, 347-48, 876 P2d 761 (1994) ("If a contract is ambiguous, the trier of fact will ascertain the intent of the parties and construe the contract consistent with the intent of the parties."); *Farnsworth on Contracts* § 7.8 (discussing the relationship between "vague" and "ambiguous" terms and noting that both are properly for the factfinder); *Walton et ux v. Denhart*

*et ux*, 226 Or 254, 260, 359 P2d 890 (1961) (holding that the words "on or about" in a contract "do not, as to time, mean 'exactly,' but 'approximately,' and as so construed grant a reasonable time for performance after the date mentioned").

In sum, because the letter of intent demonstrates that the parties intended to be bound by specific negotiation terms and because those terms are sufficiently definite, we conclude that the letter of intent constitutes an enforceable contract. The trial court erred in concluding otherwise.

■   We next consider the trial court's alternative basis for granting JNOV, namely, that the damages that plaintiff sought were not recoverable. Defendant argued to the trial court that the jury's verdict should be set aside because the damages that it awarded were not caused by the breach and were not foreseeable. The court agreed and set aside the jury's verdict. We review to determine whether there is any evidence in support of the jury's award. *Brasch v. Quan*, 162 Or App 472, 476, 986 P2d 1183 (1999). Because the jury awarded only the consequential damages that plaintiff sought—that is, the damages that she incurred as a result of her tax liability—we consider only the propriety of that award.

■   A plaintiff may recover damages for breach of contract if the damages are (1) caused by the breach, (2) foreseeable, and (3) not too speculative. *See Dynagraphics, Inc. v. U.S. National Bank of Oregon*, 100 Or App 108, 112-13, 785 P2d 760 (1990) (damages must be caused in fact by breach and must be foreseeable, that is, either arise naturally from the breach or have been within the contemplation of the parties at the time they made the contract); *Bixler v. First National Bank*, 49 Or App 195, 202, 619 P2d 895 (1980) ("[D]amages must be established by evidence upon which their existence and amount may be determined with reasonable certainty.").

As to causation, defendant argues that the only losses that can be caused by a breach of a contract to negotiate are out-of-pocket expenses incurred in the negotiations. It contends that the tax losses awarded by the jury were not caused by its breach of the agreement to negotiate but,

instead, by the fact that the parties did not enter into a purchase and sale agreement for the property. Defendant argues that it had the right to back out of negotiations for any good faith reason and, therefore, plaintiff failed to prove that, but for defendant's breach, the parties would have entered into a final contract.

The jury, however, found that plaintiff's tax losses were caused by defendant's breach of the contract to negotiate. The trial court instructed the jury that the letter of intent formed a contract between the parties to abide by the specific negotiation terms but that it was not a binding agreement to sell or buy the property. The court instructed the jury that, if it found that defendant breached the contract, then it was to decide whether the breach caused the loss and, if it did cause the loss, how much money should be paid. The court told the jury that it could award money for those damages that arise naturally and necessarily from the breach of contract and would place plaintiff in the same position as if the contract had not been breached. The jury returned a special verdict that answered four questions. The last two questions involved damages. One question asked, "Was plaintiff damaged as a result of defendant's breach?" The jury answered, "Yes." The last question asked, "What are plaintiff's damages?" The jury filled in $919,652.

■     We will uphold the jury's verdict if there is any evidence in the record to support it. Or Const, Art VII, § 3. Plaintiff adduced evidence that (1) the parties had tentatively agreed on a price for the property and a closing date, (2) they were on schedule to meet that closing date, (3) plaintiff was in a position to obtain financing, (4) the property had sold to a third party in short order, showing that there were no serious environmental, title, or other problems with the property that would have precluded the sale, and (5) the property would have qualified for a section 1031 exchange and plaintiff would have avoided $919,605 in tax liability if the deal had gone through. Although defendant retained the right to back out of the negotiations, the jury could infer that defendant would not have done so had it not entertained a better offer from another party, and that the parties would have entered into a binding purchase and sale agreement. Thus, there is evidence to support the jury's finding that, but for

defendant's breach, plaintiff would not have incurred the tax liability. We therefore reject defendant's argument that plaintiff failed to present evidence that her damages were caused by defendant's breach.

As to whether the damages were foreseeable, defendant argues that the damages here were not within the reasonable contemplation of the parties because the letter of intent stated that the parties did not intend to be bound by a purchase and sale agreement. According to defendant, no reasonable factfinder could conclude that plaintiff's tax losses were either the natural and probable result of the breach or within the reasonable contemplation of the parties.

■ We disagree. The rule that damages must be foreseeable "does not require that the defendant should have had the resulting injury in contemplation or should have promised either impliedly or expressly to pay therefor in case of breach." Arthur Linton Corbin, 5 *Corbin on Contracts* § 1009 (1950). Instead:

> " 'All that is necessary, in order to charge the defendant with a particular loss, is that it is one that ordinarily follows the breach of such a contract in the usual course of events, or that reasonable [persons] in the position of the parties would have foreseen as a probable result of breach. It is not necessary that the parties should have given the matter a moment's thought or should have expressed themselves on the subject * * *.' "

*Cont. Plants v. Measured Mkt.*, 274 Or 621, 626, 547 P2d 1368 (1976) (quoting 5 *Corbin on Contracts* § 1010).

■ Whether damages are foreseeable is a question of fact for the jury. *Dynagraphics, Inc.*, 100 Or App at 113. The jury here found that plaintiff's damages were foreseeable, and there is evidence to support that finding. Plaintiff adduced evidence that her broker told defendant's president that plaintiff was a "motivated 1031 buyer" and that she was on a short timeline with her section 1031 exchange. There is also evidence that defendant's president was acquainted with the rules and timelines governing section 1031 exchanges and that he understood the term "1031 buyer" to mean someone who had already sold property and is looking for replacement property that can be acquired within section

1031's strict timelines. That evidence supports the jury's finding that reasonable people in the position of the parties would have foreseen plaintiff's damages as a natural result of the breach. We therefore reject defendant's argument that the damages were not foreseeable as a matter of law.

As to whether the existence and amount of damages must be proved with reasonable certainty, we note that this is not a case in which damages are too speculative to be recoverable. As Chief Judge Posner observed in *Venture Assocs. Corp.*, the difficulty of calculating damages is the chief obstacle to allowing expectation damages for breach of an agreement to negotiate:

> "[I]f the plaintiff can prove that had it not been for the defendant's bad faith the parties would have made a final contract, then the loss of the benefit of the contract is a consequence of the defendant's bad faith, and, provided that it is a foreseeable consequence, the defendant is liable for that loss—liable, that is, for the plaintiff's consequential damages. The difficulty, which may well be insuperable, is that since by hypothesis the parties had not agreed on *any* of the terms of their contract, it may be impossible to determine what those terms would have been and hence what profit the victim of bad faith would have had."

96 F3d at 278-79 (emphasis in original; citations omitted).

In this case, the jury did not award plaintiff expectation damages and, thus, we are not presented with the problem of attempting to discern what the terms of the purchase and sale agreement would have been and what profit plaintiff would have had. Instead, the jury awarded plaintiff only her tax losses, the existence and amount of which are not in dispute. Thus, the damages that the jury awarded are not too speculative.

In sum, the trial court erred in concluding that consequential damages were not recoverable in this case. It follows that we must reverse the trial court's judgment unless there is an alternative basis for affirmance. We therefore turn to defendant's other arguments in support of affirmance.

Defendant argues that the trial court erred in denying its motion for a directed verdict on the ground that it was excused from performance because "plaintiff failed to satisfy a condition precedent to performance under the [letter of intent] by failing to deliver a draft purchase and sale agreement until 21 days after" the parties signed the letter of intent. It argues that there was insufficient evidence that plaintiff satisfied the condition precedent to provide the draft agreement within "approximately" 15 days and that the trial court erroneously allowed the issue to go to the jury because it erroneously concluded that the jury need only find that plaintiff did not *materially* breach the contract. According to defendant, the trial court "applied the wrong standard" because materiality is not relevant to the issue of whether a condition precedent was satisfied. *Compare Hoffman v. Employer's Liability Corp.*, 146 Or 66, 70, 29 P2d 557 (1934)) (discussing conditions precedent) *with Percy v. Miller et al.*, 197 Or 230, 245, 251 P2d 463 (1953) (discussing constructive conditions, including material breach).

The jury, however, found that plaintiff fully satisfied her obligation to timely provide a draft agreement. The court instructed the jury that plaintiff's obligation to provide the initial draft of the purchase and sale agreement within approximately 15 days was a "condition precedent" to defendant's obligations under the contract. It explained that a condition precedent is an act that must be performed before liability arises on the promise that the condition qualifies. The trial court did not instruct the jury on materiality, and nothing in the record indicates that the jury thought that it could find for plaintiff if it determined that she had not fully performed her obligations under the contract.

After receiving those instructions, the jury returned a special verdict finding that plaintiff fully performed her obligations. The first question on the verdict form asked,

"Did defendant, D.W. Sivers Co., fail to perform as required by the contract with plaintiff, Lillian Logan, by refusing to negotiate a Purchase and Sale Agreement on Barnes Miller Village, after plaintiff failed to produce a draft Purchase and Sale Agreement until twenty-one (21) days after full execution of the Letter of Intent?"

The jury answered, "Yes." The second question asked,

> "Did defendant fail to perform as required by the contract with plaintiff by selling Barnes Miller Village to a third party, after plaintiff failed to produce a draft Purchase and Sale Agreement until twenty-one (21) days after full execution of the Letter of Intent?"

The jury again answered, "Yes."

We conclude that ample evidence supports the finding that plaintiff timely delivered the agreement. First, there was evidence that the parties intended that the term "approximately" be flexible, and from that the jury could infer that the parties were not in a great hurry to execute the draft agreement. Second, there was evidence that defendant acquiesced in plaintiff's delay in delivering the agreement by never objecting to the delay, even though defendant was in regular contact with plaintiff's broker. The jury could reasonably infer that, if defendant thought that an unreasonable period of time had passed without delivery of the draft agreement, defendant would have requested that plaintiff deliver the document immediately. Third, there was evidence that the closing date contemplated by the letter of intent could be maintained so long as the parties executed the purchase and sale agreement within 45 days of signing the letter of intent. The jury could have inferred that, under those circumstances, 21 days was a reasonable period of time within which to deliver the draft agreement because that left ample time for the parties to execute the agreement and close on the date originally contemplated. *See Walton*, 226 Or at 260 (the word "approximately" connotes a reasonable period of time under the circumstances). Thus, evidence supports the jury's finding that plaintiff satisfied her obligation to deliver the draft agreement in time for it to be executed within "approximately" 15 days. It follows that we cannot affirm the trial court's grant of JNOV on the ground that defendant's breach was excused.

Defendant also argues that we should affirm the trial court on the alternative ground that plaintiff failed to prove that she was "ready, willing, and able" to perform under the contract because she did not present sufficient evidence of her ability to obtain financing. In support of that argument,

defendant relies on *Voin v. Szabo*, 139 Or App 590, 913 P2d 717 (1996), in which we held, on *de novo* review, that the plaintiffs were not entitled to specific performance because the only evidence that they adduced of their ability to purchase property under the contract was testimony by a mortgage broker that they would have qualified for financing but it would have been very close. *Voin* does not help defendant; the plaintiffs in that case sought specific performance, a remedy that plaintiff here does not seek. The requirement that a party be "ready, willing, and able" to perform is a requirement only for obtaining specific performance. Moreover, because the plaintiffs in *Voin* sought an equitable remedy, we reviewed the facts *de novo*. In this case, we review for any evidence to support the jury's verdict. As discussed above, the jury found that, but for defendant's breach of the agreement to negotiate, the contract likely would have been completed and plaintiff would not have incurred the tax liability that she did. There was evidence to support that finding, including testimony by plaintiff's broker that she "most definitely" could have obtained financing. Thus, we reject defendant's argument that we should affirm the trial court on the alternative ground of lack of readiness to perform.

In sum, the agreement to negotiate was enforceable and there was evidence to support the jury's findings that defendant inexcusably breached the agreement and that plaintiff's tax losses were the foreseeable result of that breach. It follows that the trial court erred in setting aside the jury's verdict and entering judgment for defendant.

On appeal, reversed and remanded with instructions to reinstate the jury's verdict; affirmed on cross-appeal.