Argued and submitted May 2, decision of Court of Appeals affirmed in part and reversed in part; judgment of circuit court affirmed in part and reversed in part; and case remanded to circuit court for further proceedings October 18, reconsideration denied December 26, 2007

Lillian R. LOGAN,
*Respondent on Review,*

*v.*

D. W. SIVERS CO.,
an Oregon corporation,
*Petitioner on Review.*

(CC C031273CV; CA A125412; SC S54251)

169 P3d 1255

Thomas M. Christ, of Cosgrave Vergeer Kester LLP, Portland, argued the cause and filed the brief for petitioner on review. With him on the brief were Julie A. Smith, also from Cosgrave Vergeer Kester LLP, and Michael B. Merchant and James M. Baumgartner, of Black Helterline LLP, Portland.

James E. Mountain, Jr., of Harrang Long Gary Rudnick, P.C., Portland, argued the cause and filed the brief for respondent on review. With him on the brief was Jona Maukonen.

Thomas S. Smith and Gregory A. Chaimov, of Davis Wright Termaine, LLP, Portland, filed the brief for *amici curiae* Oregon Association of Realtors, Inc., and Commercial Association of Realtors Oregon/SW Washington, Inc.

GILLETTE, J.

Kistler, J., concurred in part and dissented in part and filed an opinion, in which Durham and Walters, JJ., joined.

**GILLETTE, J.**

This case arises out of a property owner's promise to a prospective buyer to refrain from soliciting or accepting offers from other potential buyers for a specified period of time, during which time the parties anticipated that they would be able to negotiate a binding agreement for the sale and purchase of the property in question. At issue is the enforceability of such a promise, when it is made in the context of a "letter of intent" that elsewhere expressly provides that only a fully executed purchase and sale agreement will create binding obligations between the parties. Also at issue is the proper measure of damages for a breach of a "nonsolicitation" provision in that context, should the breach be actionable. The Court of Appeals held that the owner's promise was enforceable and that a jury permissibly could conclude that the appropriate measure of damages was plaintiff's increased tax liability resulting from her inability to buy the property in question. *Logan v. D. W. Sivers Co.*, 207 Or App 231, 141 P3d 589 (2006). For the reasons that follow, we affirm in part and reverse in part the decision of the Court of Appeals. In so doing, we agree with the Court of Appeals that nonsolicitation promises like the one involved here may be enforceable. However, we also are of the view that, in this case, the letter of intent contained no promise by defendant, the breach of which would serve as the basis for an award of the kind of damages that plaintiff seeks here.

The relevant facts are as follows. In January 2003, plaintiff realized a substantial profit—$3.9 million—on the sale of a piece of productive land that had belonged to her family for a number of years. Plaintiff intended to use the proceeds of that sale to purchase other investment properties, at least in part because she wished to take advantage of the "1031 exchange" provision in the federal tax code, 26 USC § 1031. Under that provision, any gain on the sale of an investment property will produce no immediate tax consequences if the property, in essence, is "exchanged" for other investment property of like kind.

To qualify as an "exchange" for purposes of 26 USC § 1031, a replacement property must be designated as such

within 45 days of the sale of the original property and purchased with the gain realized on the original sale within 180 days of the original sale. 26 USC § 1031(a)(1). For plaintiff, that meant that she had to identify up to three potential replacement properties by March 17, 2003, and purchase the replacement properties by late July 2003. If she failed to meet those deadlines, she would have to treat some or all of the $3.9 million that she had earned on the sale of the original property as a capital gain, increasing her overall tax liability by an amount potentially exceeding $900,000.

In early March, plaintiff already had designated two potential replacement properties and had obtained signed letters of intent from the owners of those properties. She told her real estate broker at that time that she also was interested in purchasing a nearby shopping mall that was not then on the market. Her real estate broker contacted defendant, the owner of the shopping mall, about a possible purchase of the mall. The broker told defendant's president that plaintiff was a "motivated 1031 buyer." Defendant's president understood that to mean that the buyer had to acquire replacement property within a relatively short period of time in order to secure the tax advantages provided by section 1031.

After some preliminary negotiations, plaintiff and defendant entered into a letter of intent, which set out a framework for defendant's sale of the shopping mall to plaintiff, including a purchase price ($5.28 million) and a closing date (June 30, 2003). The letter of intent contained several provisions that are relevant to the present controversy. First, it listed several "conditions of purchase," including

> "[a] fully-executed Purchase and Sale Agreement [to be finalized and signed] within approximately fifteen (15) days of signature by both parties of this Letter of Intent; Purchaser shall provide the initial draft of the Purchase and Sale Agreement."

In addition, the agreement contained a nonsolicitation clause:

> "Seller and/or its representatives agree that it will not seek nor enter into a letter of intent or purchase agreement for sale of the Property with any third party for a period of sixty

(60) days from the date this Letter of Intent is signed by both parties and becomes effective."

Finally, the letter of intent stated, at considerable length, the extent to which it was not intended to constitute a binding agreement for the sale and purchase of the property. However, that statement contained an important qualification:

"Seller and Purchaser acknowledge that this Letter of Intent proposal is not a binding agreement and that it is intended solely to establish the principal terms of the purchase and as a basis for the preparation of a binding Purchase and Sale Agreement. The Purchase and Sale Agreement shall be subject to Seller's and Purchaser's approvals and approval by their respective counsel, and only a fully executed Purchase and Sale Agreement shall constitute a binding transaction and binding obligation between the parties; *provided, however, that in consideration of Purchaser's good faith efforts to review the due diligence material provided by Seller, Seller agrees to be bound to provide the required due diligence documents to Purchaser within the time required and to comply with the Non-Solicitation provision set forth above.*"

(Emphasis added.) As soon as defendant executed the letter of intent, plaintiff designated the shopping mall as her third section 1031 replacement property—just in time to meet the 45-day identification deadline on March 17, 2003.

Over the next few weeks, plaintiff's broker called defendant's officers on a number of occasions to ask for due diligence materials and to tell them that a draft purchase and sale agreement soon would be complete. On April 4, 2003, the twenty-first day after the letter of intent was signed, plaintiff's broker learned that defendant had accepted another party's offer to purchase the property. Plaintiff's broker attempted to salvage the deal between plaintiff and defendant, and plaintiff's lawyer immediately sent a draft purchase and sale agreement to defendant by e-mail. However, defendant already had committed to the other offer and refused to negotiate any further with plaintiff or her agents.

By that time, plaintiff had decided that one of her other designated replacement properties was too problematic

to purchase. Although plaintiff did purchase the third designated property, that purchase absorbed only a small part of plaintiff's gain on the sale of the original property. Plaintiff was required to pay over $900,000 in taxes on the remaining gain, a result that she would have avoided if she had succeeded in purchasing defendant's shopping mall.

Plaintiff then brought the present action against defendant, alleging that defendant had breached its promise to refrain from seeking offers on the property or from entering into any agreement to sell the property to others for 60 days. Among other things, plaintiff sought over $900,000 in consequential damages, based on the tax effects of her failure to make a timely section 1031 exchange.

The case went to trial and defendant eventually moved for a directed verdict on a number of alternative grounds, three of which are at issue here. Defendant argued, first, that the letter of intent was a mere "agreement to agree" and, as such, was unenforceable in its entirety; second, defendant argued that any failure by defendant to adhere to its promise to refrain from accepting other offers was excused by a failure of a condition precedent, *viz.*, execution of a final purchase and sale agreement within "approximately fifteen (15) days"; and, third, defendant argued that, in any event, plaintiff was not entitled to recover damages measured by the tax loss consequences of her failure to make the hoped-for section 1031 exchange. The trial court initially indicated that it would grant defendant's motion for a directed verdict on two of the grounds[1] but, upon plaintiff's request and pursuant to ORCP 63 B,[2] it allowed the case to go to the jury. The jury returned a verdict for plaintiff, awarding

---

[1] The trial court rejected defendant's claim that its obligations under the letter of intent were excused because plaintiff had failed to satisfy a condition precedent—that she produce a draft purchase and sale agreement with sufficient speed that a final agreement could be executed within "approximately fifteen (15) days" of the execution of the letter of intent.

[2] ORCP 63 B allows a trial court to reserve its ruling on a motion for a directed verdict until after the jury has issued a verdict. It provides:

"In any case where, in the opinion of the court, a motion for a directed verdict ought to be granted, it may nevertheless, at the request of the adverse party, submit the case to the jury with leave to the moving party to move for judgment in such party's favor if the verdict is otherwise than as would have been directed or if the jury cannot agree on a verdict."

her an amount in damages that was equivalent to her tax losses. Upon defendant's motion, however, the trial court then reinstated its previous order granting a directed verdict and entered judgment for defendant.

Plaintiff appealed to the Court of Appeals, arguing that the trial court had erred in overriding the jury's verdict. The Court of Appeals agreed with all of plaintiff's arguments, holding that (1) the letter of intent contained terms that were enforceable; (2) evidence in the record supported the jury's implicit determination that plaintiff had satisfied her obligations under a provision calling for execution of a purchase and sale agreement within "approximately fifteen (15) days"; (3) evidence in the record also supported the jury's implicit conclusion that defendant's breach of its obligations under the letter of intent had caused plaintiff's tax losses and that the tax loss was a foreseeable result of the breach. *Logan*, 207 Or App at 242-48. Consistent with those holdings, the Court of Appeals reversed and remanded with instructions to the trial court to reinstate the jury's verdict for plaintiff. *Id.* at 249. We allowed defendant's petition for review of that decision.

■ Defendant first objects to the Court of Appeals' holding that the letter of intent contained at least some terms that were enforceable, including defendant's promise not to solicit or accept other offers on the property for a 60-day period. Defendant contends that the letter of intent was merely a framework for future negotiations, expressing nothing more than the parties' hope that agreement could be reached. Such agreements, defendant argues, are not enforceable.

That argument has the wrong focus. Although a provision of the letter of intent *does* expressly provide that the parties intend only to set out a framework for a future purchase and sale agreement and that the letter, as a whole, is nonbinding and "subject to approval," the last part of that provision identifies three specific terms as exceptions to that general nonbinding intent:

> "provided, *however*, that *in consideration* of Purchaser's good faith efforts to review the due diligence material provided by Seller, *Seller agrees to be bound* to provide the

required due diligence documents to Purchaser within the time required *and* to comply with the Non-Solicitation provision set forth above."

(Emphases added.) Those words clearly convey that the parties intended that the three specified promises—defendant's promises to provide due diligence materials and to abide by the nonsolicitation provision, and plaintiff's return promise to review the due diligence material in good faith—be binding. Thus, unless those terms are so indefinite that a court cannot determine what the parties intended, they form a contract that *is* binding. *See generally Bonnevier et ux v. Dairy Coop. Ass'n*, 227 Or 123, 361 P2d 262 (1961) (contract is not enforceable if its terms are so indefinite that court cannot decide what they mean or fix exactly the legal liabilities of the parties).

■    Defendant responds that the terms *are* too indefinite. It contends that the letter of intent is, at best, an "agreement to negotiate" and that such agreements simply are too indefinite to be enforced. That is so, defendant argues, because agreements to negotiate leave all terms unresolved, still subject to negotiation. In so arguing, however, defendant is focusing on the label, rather than the substance, of the parties' promises. The enforceability of a contract or agreement does not depend on whether it properly may be categorized as "preliminary," or an "agreement to agree," or an "agreement to negotiate." Rather, it is the contents of the agreement and what the parties intended that is important. And, with respect to those contents and that intent, we can state categorically that this agreement, although narrowly drawn, does contain an exchange of promises that the parties intended to be binding and that are sufficiently definite to allow a jury or court to determine what is required of each party. Thus, those promises *are* binding; with respect to each of the three promises, the parties' obligations are clearly identified and ascertainable, and it simply is a matter of determining whether, how, and when one or more of them was breached. (As noted, the jury found a breach and the evidence supports such a finding.)

Defendant argues, however, that, even if the letter of intent contains terms that otherwise are binding, they were

*only* binding as long as the parties chose to continue negotiations. And, defendant notes, the parties were under no obligation to continue the negotiation in this case. It therefore insists that, in the absence of any such obligation, either party could have walked away at any point and thereby ended any and all obligations under the letter of intent—including the obligations under the nonsolicitation provision.

In that regard, defendant likens the present case to *Feldman v. Allegheny Inter., Inc.*, 850 F2d 1217 (7th Cir 1988), a case that also involved a seller's breach of an exclusive dealings provision that appeared in the context of an otherwise nonbinding letter of intent. Defendant notes that, in *Feldman*, the court held that the seller's obligation under the exclusive dealings provision to refrain from negotiating with other parties continued only so long as both parties elected to pursue the transaction. As the *Feldman* court put it, although the parties were bound by the exclusive dealings provision, "[b]oth parties were free to end the arrangement and move on if they felt that discussions were progressing too slowly or they had reached a stalemate and believed they had better prospects elsewhere." *Id.* at 1223.

The foregoing quotation demonstrates why *Feldman* is not on point. By its own clear terms, the exclusive dealings provision in that case only was operative "while the proposed acquisition is being pursued." *Id.* at 1219. In the present case, however, the nonsolicitation provision is *not* couched in terms of the parties' continued commitment to negotiations but, instead, speaks in terms of a specific period of time—60 days—during which it shall be operative. Assuming that defendant is correct that the letter of intent imposes no obligation on the parties to continue negotiating until an agreement is reached, that fact has no bearing on defendant's obligations under the 60-day nonsolicitation provision, and clearly does not render that provision unenforceable. Defendant might choose to walk away from its negotiations with plaintiff, but the prohibition on selling the property to, or soliciting, other parties for a period of 60 days would remain in force and would make such a choice by defendant less likely—the very reason plaintiff would seek defendant's promise on that point in the letter of intent.

We conclude that, although the letter of intent was not, as a whole, a binding agreement for the sale and purchase of the property in question, it did contain certain promises that were binding, one of which was defendant's promise to neither solicit nor accept other offers on the property for a period of 60 days. The Court of Appeals thus was correct in holding that the trial court erred in granting a directed verdict to defendant on that ground.

■     We turn to defendant's second argument for reversing the Court of Appeals—that defendant was excused from its obligations under the agreement because plaintiff failed to perform a condition precedent. Defendant contends, in particular, that plaintiff failed to satisfy a "condition of purchase" that required her to produce the first draft of a purchase and sale agreement with sufficient speed that a final agreement could be "fully executed" within "approximately fifteen (15) days." The record shows that plaintiff did not deliver a draft purchase and sale agreement to defendant until 21 days after the letter of intent was executed.

The Court of Appeals concluded that the trial court had correctly rejected that argument. After stating that the question of whether plaintiff had failed to satisfy her obligations under the "approximately fifteen (15) days" condition was for the jury to decide, and that the jury had found that the longer period was permissible, the Court of Appeals held that there was "ample evidence" supporting the jury's implicit finding that plaintiff had timely performed:

> "First, there was evidence that the parties intended that the term 'approximately' be flexible, and from that the jury could infer that the parties were not in a great hurry to execute the draft agreement. Second, there was evidence that defendant acquiesced in plaintiff's delay in delivering the agreement by never objecting to the delay * * *. Third, there was evidence that the closing date contemplated by the letter of intent could be maintained so long as the parties executed the purchase and sale agreement within 45 days of signing the letter of intent. The jury could have inferred that, under those circumstances, 21 days was a reasonable period of time within which to deliver the draft agreement because that left ample time for the parties to

execute the agreement and close on the date originally contemplated."

*Logan*, 207 Or App at 248.

Defendant contends that the Court of Appeals' analysis is incorrect from the start because, *as a matter of law*, plaintiff's delivery of a draft agreement six days after the targeted date for executing the final agreement did not satisfy the condition at issue. It argues that, because the letter of intent involved a series of deadlines—"approximately fifteen (15) days" for a fully executed purchase and sale agreement, followed by five days for defendant to produce due diligence materials, followed by 30 days for plaintiff to review the due diligence materials, followed by 60 days for plaintiff to procure financing—and very little room to maneuver if the stated closing date of June 30, 2003, were to be met, no reasonable jury could find that plaintiff had satisfied the condition at issue by producing a mere *draft* of a purchase and sale agreement a full six days after the targeted date for execution of a *final* agreement.

We disagree. There is no question that the words "approximately fifteen (15) days" are ambiguous in this context and that, as such, it is for the trier of fact to ascertain what the parties intended by those words. *See Pacific First Bank v. New Morgan Park Corp.*, 319 Or 342, 347-48, 876 P2d 761 (1994) (if contract is ambiguous, the trier of fact must ascertain the intent of the parties and construe the contract consistently with that intent). Here, as the Court of Appeals correctly described it, the trier of fact (the jury) implicitly found that plaintiff had fully satisfied her obligation to provide a draft agreement with sufficient speed that the condition of a fully executed agreement within "approximately fifteen (15) days" could be met.[3] We need only determine whether a reasonable jury could so find, based on the evidence that was before it.

---

[3] The trial court instructed the jury that plaintiff's obligation to timely deliver a draft agreement so that a final purchase and sale agreement could be executed within "approximately fifteen (15) days" was a condition precedent to defendant's obligations under the contract. It then presented the jury with a special verdict form that asked, in two separate questions, whether defendant had failed to perform as required by the contract "after plaintiff failed to produce a draft Purchase and Sale agreement until twenty one (21) days after full execution of the Letter of

As to that issue, we agree with the Court of Appeals that there was at least some evidence in the record that would allow a jury to conclude that the parties intended the term "approximately fifteen (15) days" to be flexible. When asked at trial about what she thought the term meant, plaintiff declined to name any particular time limit and would say only that there was "no date certain that the deal was dead." Another witness who was called by the plaintiff as an expert in commercial real estate transactions confirmed the idea that the term might be entirely flexible. He testified that, in most commercial real estate transactions, "if there's not a time-is-of-the-essence clause, dates specified in the agreement are * * * treated as flexible and are not drop-dead dates."

Defendant does not point to anything in the record that would preclude a reasonable jury from finding that, consistent with the foregoing testimony, the parties intended to describe a flexible deadline when they referred to a time period of "approximately fifteen (15) days." It is true that the letter of intent involved multiple steps and cascading deadlines—evidence that the jury might have accepted, had it wished to do so—but the deadlines involved were not so inescapably tight and the steps were not so interdependent that a delay of six days or even longer in producing a draft purchase and sale agreement would make it impossible as a matter of law to close the deal as the parties had envisioned—by June 30, 2003. We conclude that the defendant was not entitled to a directed verdict on the ground that, in waiting 21 days before submitting a draft purchase and sale agreement to defendant, plaintiff had failed to perform a condition precedent to defendant's obligations. The Court of Appeals did not err in so holding.

■   We turn to the question of damages. Defendant argues that the damages that the jury awarded and that the Court of Appeals reinstated, which were based on the taxes that plaintiff would have been able to avoid if she had been able to purchase the property at issue and effect a section

Intent." The jury answered both questions "yes," implicitly finding that plaintiff's delivery of a draft agreement after 21 days satisfied the "approximately fifteen (15) days" condition.

1031 exchange, were not available to plaintiff as a matter of law. Defendant contends that any such damage award ultimately and necessarily rests on the idea that plaintiff had an enforceable contractual right to purchase the property, an idea that is contrary to the express terms of the contract.

In reinstating that damage award, the Court of Appeals posited a fairly involved string of inferences that would have allowed the jury to conclude, from the evidence in the record, that plaintiff's tax losses were a direct consequence of defendant's breach of the nonsolicitation provision. One step in that string of inferences is particularly notable, *i.e.*, the inference that, "[a]lthough defendant retained the right to back out of the negotiations, the jury could infer that defendant would not have done so had it not entertained a better offer from another party, and that the parties would have entered into a binding purchase and sale agreement." 207 Or App at 244. Also significant is the Court of Appeals' holding that the jury reasonably could find, based on the evidence in the record, that tax losses arising out of plaintiff's inability to timely purchase a replacement property were a foreseeable and natural result of defendant's breach of the nonsolicitation provision—in spite of the absence of any actual obligation on defendant's part to sell the property to plaintiff.[4] 207 Or App at 245-46.

The difficulty with the foregoing analysis is that it fails to give proper consideration to the specific wording of the contract at issue and, particularly, to the parties' express and thorough disclaimer of any intent to bind themselves to a purchase and sale. We return to the operative words of the parties' agreement to illustrate the point. In doing so, we emphasize again that the agreement contained only three

---

[4] The Court of Appeals focused, in that regard, on evidence that defendant had been told plaintiff was a "motivated 1031 buyer" and on the idea that foreseeability does not require actual contemplation of the resulting injury, but only that "reasonable [persons] in the position of the parties would have foreseen [the injury] as a probable result of breach." *Logan*, 207 Or at 245 (quoting *Cont. Plants v. Measure Mkt*, 274 Or 621, 626, 547 P2d 1368 (1976)). The Court of Appeals intimated, in short, that a *reasonable* jury could find that a *reasonable person* who knew that he or she was dealing with a "motivated 1031 buyer" would have foreseen that breaching the nonsolicitation provision would probably result in plaintiff's loss of the tax benefits of a section 1031 exchange.

binding promises: (1) plaintiff's promise to conduct a good faith review of "due diligence" documents provided by defendant; (2) defendant's promise to provide the due diligence documents within a certain time; and (3) defendant's promise to comply with the nonsolicitation provision. What is absent is any binding obligation to bargain in good faith to achieve the contemplated sale—each party remained free to sit on its hands and do nothing. Each party also might hope that the other would not behave in that way, but such a party had nothing beyond that hope on which to risk its financial circumstances. As the parties' agreement put it: "[O]nly a fully executed Purchase and Sale Agreement shall constitute a binding transaction and binding obligation between the parties." The parties clearly intended, and clearly had the right to expect, that that disclaimer would shield them from any liability for failing to carry through with the sale that then was being contemplated. In the face of such a disclaimer, it is irrelevant that a reasonable person in the same position as defendant might have foreseen that plaintiff would suffer tax losses down the road if defendant declined to go through with the contemplated sale, either by selling to another party in breach of the nonsolicitation provision or otherwise. It also is irrelevant whether defendant would have sold the property to plaintiff if it had not been diverted by another party's offer. The parties expressly declined, in the letter of intent, to assume the risks of injury inherent in a completed contract of purchase and sale. Defendant cannot now be saddled with those very same liabilities on the theory that, because defendant likely would have sold the property to plaintiff except for its breach of its lesser promise not to sell the property to someone else for 60 days, those liabilities are the natural and foreseeable consequences of defendant's breach. We repeat the important distinction here: Defendant's obligation not to solicit or sell to others for 60 days did *not* include any promise to negotiate in good faith—or at all—during that 60-day period.

■ In arguing otherwise, plaintiff relies on *Senior Estates v. Bauman Homes*, 272 Or 577, 583-84, 539 P2d 142 (1975), a case that recognizes and explains Oregon's long-established rule that, in an appropriate case, the victim of a

breach of contract may recover not only her loss of bargain damages, but also consequential damages. The Oregon rule, as stated in that case, is straightforward:

> " '[T]he *plaintiff may recover such damages, including gains prevented as well as losses sustained, as may reasonably be supposed to have been within the contemplation of both parties at the time of the making of the contract as the proximate and natural consequence of a breach by defendant.*' "

*Id.* at 585 (quoting *Blagen v. Thompson*, 23 Or 239, 248, 31 P 647 (1892); emphasis in original).

We have no quibble with that rule when the circumstances support its application. On the facts of the present case, however, they do not. We note again that the parties were at pains in their letter of intent to identify what they were *not* agreeing to do: Defendant was not agreeing to sell, or even to negotiate in good faith toward selling, and plaintiff was not agreeing to buy, or even to negotiate in good faith toward buying, the property in question. The document in this case contains the opposite understanding:

> "Seller and Purchaser acknowledge that *this Letter of Intent proposal is not a binding agreement* and that it is intended solely to establish the principal terms of the purchase and as a basis for the preparation of a binding Purchase and Sales Agreement. * * * [O]nly a fully executed Purchase and Sale Agreement shall constitute a binding transaction and binding obligation between the parties."

(Emphasis added.) The foregoing pledge *not* to be bound to buy or sell is entitled to enforcement. *See, e.g.*, *Senior Estates*, 272 Or at 590 (although vendor of real estate was entitled to certain consequential damages from defaulting purchasers, award could not include amount for title insurance costs because, "by the terms of the contract itself, [plaintiff] was to assume [that] expense").

Put differently, defendant's nonsolicitation promise was directed to the *manner* of the negotiations and not to their *outcome*, and the damages that may be deemed to have arisen from defendant's breach of that promise are similarly limited. Under the narrow and specific bargain struck by the parties here, plaintiff may be able to charge defendant with

any expenses that she incurred (and wasted) in attempting to negotiate a final agreement with defendant for the purchase and sale of defendant's property. But, because defendant never agreed to sell or even to negotiate in good faith toward the sale of the property to plaintiff (and, in fact, explicitly disclaimed any such agreement when it signed the letter of intent), plaintiff cannot, under this contract, charge defendant with losses that flowed from her inability to finally purchase it.[5] The trial court properly set aside the jury's award of damages of that kind (*i.e.*, damages that were based on taxes that plaintiff could have avoided had she succeeded in timely purchasing defendant's property), and the Court of Appeals erred when it ordered the trial court to reinstate the jury's verdict. That part of the Court of Appeals decision must be reversed.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court for further proceedings.

**KISTLER, J.,** concurring in part and dissenting in part.

This case arises out of an increasingly common practice in real estate sales. The parties signed a letter of intent setting out the principal terms of a proposed sale of real property. The letter of intent made clear that it did not impose a binding obligation on either party to go through with the sale. It did, however, impose a binding obligation on defendant, for a period of 60 days, not to solicit or enter into a sale agreement with anyone other than plaintiff. Although defendant breached that promise, the majority holds that plaintiff cannot recover expectation damages for defendant's breach. That is so even though the jury implicitly found (and there is evidence to support its finding) that defendant would have gone through with the sale to plaintiff at the agreed-upon price if defendant had honored the 60-day, nonsolicitation

---

[5] The interesting dissent of Kistler, J., makes several thoughtful points that, in the context of a more expansive contract, might have some pertinence. But this contract, with its narrow promises and its sweeping disavowal of any other obligations, is not a platform from which the dissent's exegesis on consequential damages properly can be launched.

provision. The majority cites no authority in support of its holding, and both the case law and the commentary lead to precisely the opposite conclusion. I respectfully dissent from the decision denying plaintiff her expectation damages.[1]

The relevant facts are straightforward. Plaintiff had sold real property that she owned for $3.9 million. She needed to invest the proceeds of that sale in similar property within a fairly brief period of time in order to defer recognizing the gain that she had realized on the sale. *See* 26 USC § 1031 (permitting sellers to defer recognizing gain from property sales if they identify like-kind property within 45 days of the sale and complete the exchange within 180 days). Plaintiff was interested in purchasing property that defendant owned, and she and defendant entered into a letter of intent on March 14, 2003, to establish "the principal terms of the purchase." The letter made clear that it was not a binding agreement. Rather, the parties intended that it would serve only "as a basis for the preparation of a binding Purchase and Sale Agreement." As noted, however, defendant expressly agreed to be bound in one respect. Defendant "agree[d] that it will not seek nor enter into a letter of intent or purchase agreement for sale of the Property with any third party for a period of sixty (60) days" from the date that the parties signed the letter of intent.

Defendant breached that promise when it entered into an agreement, within 21 days of signing the letter of intent, to sell the property to someone other than plaintiff. For the purposes of determining the damages resulting from that breach, it is important to recognize that not only was there evidence from which the jury could have found that plaintiff would have gone forward with the proposed sale if defendant had dealt only with her, but there was also evidence from which the jury could have found that, if defendant had honored the 60-day, nonsolicitation provision, it would have sold the property to plaintiff in accordance with the terms set out in the letter of intent. Specifically, defendant's

---

[1] The majority correctly holds that defendant's promise not to solicit or enter into a sale agreement for 60 days with a third party was a binding contractual obligation. It also correctly holds that plaintiff's failure to comply strictly with a condition precedent did not bar her from seeking to enforce the nonsolicitation provision. I concur in those parts of the majority's decision.

president, Dennis Sivers, testified that defendant had wanted to sell the property quickly so that defendant could complete a "1031 exchange" of its own—a deal that had to be closed soon after the end of the 60-day, nonsolicitation period. According to Sivers, defendant was so eager to close its own 1031 exchange that it would have gone through with the sale of the property to plaintiff for $5.28 million—the price on which the parties had tentatively agreed in the letter of intent.

In light of that testimony, as well as the other evidence introduced at trial, the jury reasonably could have found three critical facts. *See Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 333 Or 304, 310, 39 P3d 846 (2002) (explaining that appellate courts must uphold jury verdicts unless there is "no evidence" to support the elements of a claim). First, although defendant had no legal obligation to go through with its proposed sale to plaintiff, defendant in fact would have gone through with the sale to plaintiff if it had complied with its promise to deal only with plaintiff during the 60-day period. Second, the parties would have agreed on all the material elements of the sale, as stated in the letter of intent. *See Povey v. Chow*, 146 Or App 760, 764, 934 P2d 528 (1997) (listing material elements of land sale contracts). Finally, defendant was on notice that, if plaintiff did not purchase defendant's property, she would suffer a substantial tax loss because of her inability to defer recognizing the gain from her earlier sale.[2] In short, there was evidence to support the jury's finding that, if defendant had honored the nonsolicitation provision, it would have sold its property to plaintiff, and she would not have suffered over $900,000 in tax losses. Put differently, there was evidence to support the jury's award of over $900,000 in expectation damages to plaintiff.

Despite that evidence, the majority holds as a matter of law that plaintiff may not recover the expectation damages that defendant's breach caused. The majority's holding appears to rest solely on the following proposition: Because

---

[2] The jury's verdict does not specify the specific loss for which it awarded plaintiff damages. The amount of the award, however, matches the tax loss that plaintiff suffered as a result of defendant's breach, and defendant acknowledges in its brief on the merits that the award reflects the tax loss.

defendant "declined * * * to assume the risks of injury inherent in a completed contract of purchase and sale," it "cannot now be saddled with those very same liabilities." 343 Or at 353. The majority effectively transforms the parties' lack of final agreement on the sale of the property into a disclaimer of liability for breaching a provision on which they did agree.

The primary problem with the majority's reasoning is that the letter of intent does not contain a disclaimer of liability. No provision in that letter purports either to define or limit the measure of plaintiff's damages for a breach of the nonsolicitation provision. More specifically, no provision in the letter states that defendant will not be liable for plaintiff's expectation damages should defendant breach the nonsolicitation provision. The provision stating that the letter of intent is not a binding agreement to sell land is just that: It limits the scope of the parties' agreement; it does not limit the scope of their remedies for a breach of a provision on which they did agree. The majority errs in reading into the unambiguous terms of the letter of intent a limitation on liability that the parties did not include. *See Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997) (in construing a contract, courts may not insert what the parties have omitted).

Fairly read, the terms of the letter of intent provide no support for the majority's decision. Beyond that, the majority's decision is at odds with the weight of authority, which would not preclude plaintiff, as a matter of law, from recovering her expectation damages. One of the leading decisions on the issue is *Venture Associates v. Zenith Data Systems*, 96 F3d 275 (7th Cir 1996). In that case, the plaintiff had proposed to buy a subsidiary of the defendant corporation. *Id.* at 276-77. The parties signed a letter of intent that stated, as the letter of intent does here, that it did not create a binding obligation to go through with the sale. *Id.* at 277. The letter of intent did, however, impose a binding obligation on the parties to negotiate in good faith toward a final agreement.[3] *Id.* As negotiations wore on, the defendant became

---

[3] The majority suggests that, if the letter of intent in this case had included a requirement that the parties bargain in good faith rather than a nonsolicitation provision, the result might be different. Given the majority's holding, however, it is difficult to see a principled basis for that distinction. Under the majority's reasoning, the provision stating that the letter of intent does not create a binding

concerned about the plaintiff's solvency and eventually abandoned the negotiations on that basis, selling the subsidiary to a third party. *Id.* at 278-79. The plaintiff sued, arguing that the defendant had breached its duty to negotiate in good faith and seeking expectation damages based on the terms in the letter of intent. *Id.* at 278.

Faced with the question whether the plaintiff could recover expectation damages at all, given the parties' lack of a final agreement, Judge Posner, writing for the majority, held that it could. He reasoned:

> "Damages for breach of an agreement to negotiate may be, although they are unlikely to be, the same as the damages for breach of the final contract that the parties would have signed had it not been for the defendant's bad faith. If, quite apart from any bad faith, the negotiations would have broken down, the party led on by the other party's bad faith to persist in futile negotiations can recover only his reliance damages—the expenses he incurred by being misled, in violation of the parties' agreement to negotiate in good faith, into continuing to negotiate futilely. *But if the plaintiff can prove that had it not been for the defendant's bad faith the parties would have made a final contract, then the loss of the benefit of the contract is a consequence of the defendant's bad faith, and, provided that it is a foreseeable consequence, the defendant is liable for that loss—liable, that is, for the plaintiff's consequential damages.*"

*Id.* at 278 (emphasis added). Judge Posner explained that,

> "The difficulty, which may well be insuperable, is that since by hypothesis the parties had not agreed on *any* of the terms of their contract, it may be impossible to determine what those terms would have been and hence what profit the victim of bad faith would have had. But this goes to the practicality of the remedy, not the principle of it."

*Id.* at 278-79 (citation omitted; emphasis in original).[4]

---

obligation to go through with the sale would create a disclaimer of liability that would operate equally in both situations.

[4] Although the Court in *Venture Associates* recognized in principle that a plaintiff could receive expectation damages for breach of an agreement to negotiate in good faith, it upheld the trial court's judgment for the defendant based on the trial court's finding that the defendant had not bargained in good faith. 96 F3d at 280.

In his treatise on contracts, Farnsworth agrees with Judge Posner that, in principle, an injured party is entitled to expectation damages even if, as a practical matter, there may be difficulties of proof in such cases. E. Allan Farnsworth, 1 *Farnsworth on Contracts*, § 3.26b at 397 (3d ed 2004). Farnsworth observes, however, that the concern that plaintiffs can never prove damages in this type of case may be overstated. As he notes, the difficulty of proving expectation damages in this type of case

> "may not be insuperable, because parties do not usually make agreements to negotiate until the negotiations are well advanced, so that what remains to be negotiated may be no more extensive than if the parties had made an agreement with open terms. In a growing number of decisions courts have indicated a willingness to consider awarding damages based on expectation."

*Id.*[5] Burton and Andersen reach the same conclusion, reasoning that "when the parties have worked out many of the principal economic terms of their final contract in detail, there is no obstacle to allowing expectation damages based on the bargain tentatively agreed to, but never consummated." Steven J. Burton & Eric G. Andersen, *Contractual Good Faith: Formation, Performance, Breach, Enforcement*, § 8.4.2.3 at 365 (1995). *See also* Melvin Aron Eisenberg, *The Emergence of Dynamic Contract Law*, 88 Cal L Rev 1743, 1809 (2000) (arguing that, if a breaching party wants to avoid paying expectation damages, it should offer evidence that the deal would have broken down even absent the breach); Charles L. Knapp, *Enforcing the Contract to Bargain*, 44 NYU L Rev 673, 723 (1969) ("In some cases, * * * the main terms of performance * * * may have been so agreed upon * * * that an expectation remedy can be computed with as much certainty as is usually required.").

---

[5] Interestingly, Farnsworth's views evolved from his early categorical rejection of expectation damages in cases such as this. *See* E. Allan Farnsworth, *Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations*, 87 Colum L Rev 217, 267 (1987) (arguing against expectation damages but in favor of reliance damages and damages for lost opportunities).

Thus, in *Evans, Inc. v. Tiffany & Co.*, 416 F Supp 224, 240 (ND Ill 1976), the court awarded the plaintiff expectation damages after finding that those damages were sufficiently certain and that the parties would have reached a final agreement had the defendant not breached its duty to negotiate in good faith. Similarly, in *Milex Products v. Alra Laboratories*, 237 Ill App 3d 177, 603 NE2d 1226, 1235-37 (1992), the court awarded the plaintiff expectation damages, including lost profits, for the defendant's breach of its duty to negotiate in good faith, finding that those profits were within the parties' contemplation and not too speculative. In *Walters v. Marathon Oil Co.*, 642 F2d 1098, 1100-01 (1981), the Seventh Circuit, applying Indiana law, held that the plaintiff could recover its lost profits even though the plaintiff had raised only a promissory estoppel argument; the court reasoned that the plaintiff's reliance damages were insufficient to compensate it for the defendant's misconduct and that the amount of the damages was sufficiently certain.[6]

Following the majority of courts and commentators, I would hold that a jury may award expectation damages on a proper evidentiary showing. I also would hold that, given our limited standard of review, plaintiff's evidentiary showing in this case sufficed; that is, we cannot say that there was "no evidence" from which the jury could have found that plaintiff had proved her right to recover expectation damages. *See Northwest Natural Gas Co.*, 333 Or at 310 (stating that standard of review).[7] The Court of Appeals correctly held that, on this record, plaintiff was entitled to recover her expectation damages for defendant's breach.

---

[6] Although the majority does not cite it, the New York Court of Appeals decision in *Goodstein Const. Corp. v. City of New York*, 80 NY2d 366, 604 NE2d 1356 (1992), provides support for its position. In reaching its decision, however, the Court of Appeals relied on a position that Farnsworth took in an earlier edition of his treatise on contracts to which he no longer adheres. *Compare* 80 NY2d at 374 (relying on the first edition of Farnsworth's treatise) *with* 1 *Farnsworth on Contracts*, § 3.26b at 397 (3d ed 2004) (reaching different conclusion). Beyond that, there were alternative grounds for the court's holding in *Goodstein*, and the case is better understood as resting on those grounds.

[7] The majority does not rest its contrary holding on the ground that the consequential damages that the jury awarded were either too speculative or not foreseeable. Rather, it holds that, no matter what the proof, plaintiff could not recover expectation damages.

It may be that, in many cases, a jury will find as a matter of fact that, even if the parties had honored a non-solicitation provision, they still would not have entered into an agreement to sell the property. Alternatively, even if there were evidence that the parties would have reached some agreement, the terms of that agreement may be too speculative to permit a jury to calculate expectation damages with reasonable certainty. In this case, however, the evidence permitted the jury to find that defendant would have entered into an agreement to sell the land to plaintiff if it had honored the nonsolicitation provision. Moreover, the evidence of the terms that the parties would have reached was sufficiently certain to uphold the jury's award. There is no basis in principle or in law to deny plaintiff the full extent of the damages that the jury awarded her. I respectfully dissent from the majority's contrary holding.

Durham and Walters, JJ., join in this opinion.