Filed:  August 25, 2011

IN THE SUPREME COURT OF THE STATE OF OREGON

STATE OF OREGON,

Petitioner on Review,

v.

PETRONILO LOPEZ-MINJAREZ,

Respondent on Review.

(CC C053660CR; CA A134227; SC S059045)

En Banc

On review from the Court of Appeals.*

Argued and submitted May 5, 2011.

Greg Rios, Assistant Attorney General, Salem, argued the cause for petitioner on review.  With him on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Shawn Wiley, Chief Deputy Defender, Office of Public Defense Services, Salem, argued the cause for respondent on review.  With him on the brief was Peter Gartlan, Chief Defender.

LINDER, J.

The decision of the Court of Appeals is reversed in part and affirmed in part.  The judgment of the circuit court is reversed, and the case is remanded for further proceedings.


*Appeal from Washington County Circuit Court, Gayle Nachtigal, Judge. 236 Or App 270, 237 P3d 223, *adh'd to on recons*, 237 Or App 688, 240 P3d 753 (2010).

LINDER, J.

We allowed review in this case to consider whether a uniform criminal jury instruction on aiding and abetting correctly states Oregon law.[1] As did the Court of Appeals,[2] we conclude that it does not. We further conclude, as did the Court of Appeals, that giving the instruction was prejudicial in this case. We differ, however, in our determination of which crimes were potentially affected by the instructional error. Consequently, we affirm in part and reverse in part the decision of the Court of Appeals, we reverse the judgment of the circuit court, and we remand for further proceedings.

The relevant facts were significantly disputed at trial. For purposes of our review, the facts can be briefly recounted. To assess whether the error in instructing the jury could have affected the jury's verdict on the various charges involved, however, it is important to describe both sides' respective evidence and theories of the case.

The charges in this case arose after defendant and his father drove in defendant's truck to the home of a man who was having an extra-marital affair with defendant's mother. When defendant and his father arrived at the man's home, no one was there. The victim -- the man's teenaged son -- arrived shortly thereafter. When victim arrived, defendant or his father, or the two of them together, pushed the victim

---

[1] The instruction, which we set out in full later in this opinion, is Uniform Criminal Jury Instruction 1052, "Aider or Abettor -- Liability for Probable Consequences."

[2] *State v. Lopez-Minjarez*, 236 Or App 270, 237 P3d 223, *adh'd to on recons*, 237 Or App 688, 240 P3d 753 (2010).

into the house, where the victim was shot, but not killed. The victim was then forced into defendant's truck and taken to a remote area off a logging spur road, where he was killed. Police arrested defendant later that night at his home, after a neighbor reported seeing the victim abducted and gave police the license plate number of the truck in which he was taken. Defendant's father was never apprehended by authorities.

The state indicted defendant on multiple charges based on those essential events. Specifically, alleging that all the charges were part of the "same act and transaction," the state charged defendant with:

- two counts of first-degree burglary, alleging that defendant entered and remained in the victim's home, a dwelling, with the intent to commit kidnapping (Count 12) and assault (Count 11), and caused physical injury to the victim;

- one count of second-degree assault, alleging that defendant physically injured the victim through the use of a deadly weapon;

- one count of first-degree kidnapping, alleging that defendant took the victim from one place to another, with the intent to interfere substantially with the victim's liberty and with the purpose of physically injuring the victim;

- two counts of felony murder, alleging that in the course of and in furtherance of defendant's commission of burglary in the first degree (Count 8) and kidnapping in the first degree (Count 7), a participant in the crime that defendant was committing caused the victim's death;

- three counts of aggravated murder, alleging that defendant intentionally killed the

victim in an effort to conceal the commission of the crimes of burglary (Count 1), kidnapping (Count 5), and assault (Count 3);

- three counts of aggravated murder, alleging that defendant intentionally killed the victim to conceal his and his father's identities as the persons who committed the crimes of burglary (Count 2), kidnapping (Count 6), and assault (Count 3).[3]

At trial, the state's evidence and that presented by defendant sharply diverged. According to the state, defendant and his father jointly planned to injure or kill the man having the affair with defendant's mother (defendant's father's wife), and both were present throughout and committed the crimes involved. We need not recount in detail the state's evidence, which consisted of physical and circumstantial evidence, the observations of eyewitnesses, and statements that defendant made to police. It suffices to observe that, from the state's evidence, the jury could have concluded that defendant was personally present during all the events that culminated in the victim's death -- *e.g.*, the planning of the confrontation with the victim's father, the entry into the home, the initial shooting of the victim, the victim's abduction to a distinctive remote area (one that defendant may have frequented for target shooting), and the victim's murder at that remote area. What the state could not establish was who personally pulled the trigger and shot the victim, either in the home, where the victim was shot and wounded, or at the

---

[3] Certain lesser included offenses of the charged offenses (*i.e.*, kidnapping in the second degree, burglary in the second degree, and intentional murder) were also submitted to the jury at the conclusion of the trial. In each instance, the jury found defendant guilty of the greater charge.

remote area, where he was shot and killed. Under the state's theory, however, it did not matter whether defendant or his father was the person who did so. Either way, defendant was sufficiently involved to be criminally responsible for the resulting crimes.

Defendant contradicted the state's evidence, and its theory of the case, principally through his own testimony. According to defendant, he went with his father on the night in question, believing that his father wanted to talk to the wife of the man who was having an affair with his mother, because his father saw himself and the wife as "victims" of the affair. According to defendant, he did not know that his father was armed until his father got out of the truck to confront the victim, at which point the father forced the victim into the house at gunpoint. Defendant claimed that he never entered the house, and that only his father went inside. Instead, defendant waited outside the garage and, after hearing a gunshot, stepped into the garage to try to look into the house to determine if his father had killed the victim. Defendant claimed that, after the gunshot, his father forced the victim outside and into defendant's truck. Defendant acknowledged that he drove the truck away, while his father held the victim at gunpoint. He also acknowledged that he noticed the truck running low on gas, told his father they needed to get gas, let his father get out of the truck with the victim to hide at a remote construction site while he refueled the truck, and then returned to the construction site, where his father again forced the victim back into the truck and defendant resumed driving with the victim inside, held against his will.

Defendant denied, however, driving to the remote area where the victim was killed. Instead, defendant claimed that he drove to a particular McDonald's

4

restaurant, where he remained while his father took over the driving and left with the victim. According to defendant, his father returned in the truck about 30 to 40 minutes later, without the victim. To rebut defendant's testimony that he was at the McDonald's restaurant when the victim was killed, the state presented evidence that it was not possible for someone to drive the distance between that McDonald's restaurant and where the victim was found in the time that defendant claimed he waited there for his father. The state also presented evidence that the several employees working at the McDonald's that night had not seen defendant, and that, because it was a slow night, they likely would have remembered him had he been there for 30 to 40 minutes even if, as he claimed, he was in the bathroom during much of that time.

In instructing the jury, the trial court identified the elements of each of the substantive crimes with which defendant was charged. The trial court then further instructed the jury, using the pertinent uniform criminal jury instructions, on accomplice liability. Specifically, the trial court first advised the jury that a person is criminally liable for a crime, regardless of whether the person is present when the crime is committed, if the person, with the requisite intent, "aids and abets" in committing a crime:

"A person who is involved in committing a crime may be charged and convicted of that crime if, with the intent to promote or facilitate the commission of the crime[,] that person aids and abets someone in committing the crime. Under these circumstances, it is not necessary for that person actually to be personally present at the time and place of the commission of the crime."

UCrJI 1052. After that instruction, the trial court informed the jury what it means to "aid

5

and abet" in the commission of a crime:

> "A person aids and abets another person in the commission of a crime if the person, one, with the intent to promote or make easier the commission of the crime; two, encourages, procures, advises or assists by act or advice the planning or commission of the crime."

UCrJI 1053. Next, the trial court gave the uniform instruction at issue here:

> "A person who aids or abets another in committing a crime * * * is also criminally responsible for any act or other crime that [was] committed as a natural and probable consequence of the planning, preparation, or commission of the intended crime."

UCrJI 1051.

As we noted at the outset, we allowed review in this case to consider whether the last of those three instructions is a correct statement of Oregon law. Defendant argues that it is not. The Court of Appeals agreed. *State v. Lopez-Minjarez*, 236 Or App 270, 287, 237 P3d 223, *adh'd to on recons*, 237 Or App 688, 240 P3d 753 (2010). On review, the state concedes that, at least in isolation, the instruction incorrectly states the principles of accomplice liability under Oregon law. As we will explain, we, too, agree.

The analysis of why the instruction is wrong is straightforward. The legislature has codified the principles for accomplice liability in ORS 161.155. That statute provides, in part:

> "A person is criminally liable for the conduct of another person constituting a crime if:
>
> "* * * * *
>
> "(2) With the intent to promote or facilitate the commission of the crime the person:

6

"* * * * *

"(b) Aids or abets or agrees or attempts to aid or abet such other person in planning or committing the crime[.]"

Thus, the statute requires a specific intent: the intent to promote or facilitate the commission of the crime committed by another. The statute also has a conduct element: with that requisite intent, the person must assist, agree to assist, or attempt to assist in either the planning or commission of the crime committed by another.

The "natural and probable consequences" instruction (UCrJI 1051) builds on accomplice liability, but goes beyond it. The instruction advises a jury that a person who aids and abets in the commission of a crime, *in addition* to being criminally responsible for that crime, *also* is criminally responsible for "any act or other crime" that was the "natural and probable consequence" of the intended crime. In effect, the instruction tells a jury that, once it finds liability based on an aiding and abetting theory, it can find a defendant guilty of any *other* crimes that the jury finds to be the natural and probable consequence of the crime for which there was accomplice liability. That criminal responsibility attaches under the instruction for any naturally consequential crime, without regard to whether the defendant acted with the intent that ORS 161.155 requires.

Put simply, Oregon law does not give rise to criminal liability on such a theory. Accomplice liability is both created by and limited by ORS 161.155. The statute creates criminal responsibility for one who aids in the planning or commission of a crime with "the intent to promote or facilitate the commission of *the* crime." As the Court of

7

Appeals correctly observed, through the use of the definite article "the" in referring to "the crime," the legislature created accomplice liability only for the crime that a defendant intended to promote or facilitate, not for any additional crimes that might be considered the natural and probable consequence of that crime, regardless of the defendant's intent. *Lopez-Minjarez*, 236 Or App at 282. The vice of the challenged uniform instruction is that it was not so limited.[4] Giving it was inconsistent with the statute, and was therefore error.[5]

As we have noted, on review in this court, the state concedes that the instruction, in and of itself, does not state the law correctly. The state's argument is only that, when the instruction is read together with the other aiding and abetting instructions that the trial court gave, the jury would have correctly understood that, to find defendant

---

[4] The fact that the erroneous instruction is part of the Uniform Criminal Jury Instructions, of course, is inconsequential in the analysis. Those uniform instructions are drafted by a committee of members of the Oregon State Bar and are not themselves the law. They instead are a salutary effort on the part of legal practitioners in Oregon to state the law in a correct way that is helpful to jurors. As this case demonstrates, that effort does not always succeed.

[5] We emphasize that the problem here is distinct to this context. ORS 161.155 describes the terms on which accomplice liability can be found; any instruction on accomplice liability must be consistent with that statute. Our conclusion in this case, therefore, does not implicate doctrines or principles in other contexts that may involve the natural and probable consequences of conduct. *See*, *e.g.*, *Wallach v. Allstate Ins. Co.*, 344 Or 314, 319-20, 180 P3d 19 (2008) (discussing tort principles by which a plaintiff can recover not only for injuries that result from negligence, but also injuries that are the natural and probable consequence of an original injury); *Logan v. D. W. Sivers Co.*, 343 Or 339, 353-54, 169 P3d 1255 (2007) (plaintiff in contract action may recover damages that are within contemplation of parties at the time of contract formation and are the natural consequence of a breach).

criminally responsible for any crime that was a natural and probable consequence of his actions as an accomplice, the jury had to also find that defendant intended to promote or facilitate the commission of those additional crimes. *See generally State v. Woodman*, 341 Or 105, 119, 138 P3d 1 (2006) (no error when instructions, read as a whole, "accurately reflected the statutory requirements").

We are not persuaded. In context, the defects of the wrong instruction become more glaring, not less so. The instructions as a whole provided the jury with three distinct theories on which, depending on the jury's view of the evidence, the jury could find defendant responsible for the various crimes with which he was charged. Effectively, the jury could find defendant guilty of a charge if it found that: (1) defendant intended to commit and personally committed the charged crime; (2) defendant, with the requisite intent, aided and abetted his father in the commission of the charged crime; or (3) the charged crime was a natural and probable consequence of any crime that defendant aided in committing. The third theory of criminal responsibility does not exist under ORS 161.155 or any other statute pertinent here. The challenged instruction was therefore wrong, both alone and in the context of the other instructions given.

The remaining question is whether that error prejudiced defendant. *State v. Thompson*, 328 Or 248, 266, 971 P2d 879, *cert den*, 527 US 1042 (1999) (court will reverse for instructional error only if instructions, when considered as a whole, prejudiced defendant). Although defendant sought reversal of all convictions based on the instructional error, the Court of Appeals affirmed defendant's convictions for kidnapping, assault, and burglary, and reversed only defendant's aggravated murder and felony

9

murder convictions. The court reasoned that defendant had essentially conceded the facts that established his criminal responsibility for the kidnapping, assault, and burglary convictions and that, therefore, the "erroneous instruction could not have affected those counts." *Lopez-Minjarez*, 236 Or App at 289. As to the homicide convictions, however, the court concluded that "the jurors reasonably could have convicted defendant of the homicides simply because they believed that the homicides were the natural and probable consequences of the earlier crimes." *Id*. at 288.

To assess prejudice, we must determine whether the jury's guilty verdict on one or more of the charges could have been based on the theory of criminal responsibility contained in the erroneous instruction. *See State v. Pine*, 336 Or 194, 210, 82 P3d 130 (2003) (reversing conviction where incorrect jury instruction "created an erroneous impression of the law that, if the jury had believed defendant's version of the facts, would have affected the outcome of the case"). As earlier quoted, the instruction advised the jury that "a person who aids and abets another in committing a crime" is "also" criminally responsible for any act or other crime committed as a natural and probable consequence of the planning, preparation, or commission of the intended crime. Thus, to trigger criminal responsibility under the erroneous instruction, the jury first had to find defendant guilty of at least one predicate crime on an accomplice (*i.e.*, aiding and abetting) theory.[6]

---

[6] Defendant argues that all convictions, including the convictions for burglary, should be reversed because he contested his intent to commit any of his father's crimes, including burglary, and maintained instead that he was "merely obeying his domineering and violent father rather than trying to aid him." The problem with that

10

The first crime, chronologically, for which the jury might have found defendant guilty on any theory, including an aiding and abetting theory, was the burglary of the victim's home. From the evidence at trial, the jury could have concluded either that defendant personally entered and remained inside the victim's home with the intent to commit a crime inside (either kidnapping, assault, or both), or that he aided and abetted his father in doing so.[7] But because the burglary was first in time, what the jury could not have done was find the burglary to have been the "natural and probable consequence" of a crime that defendant, at an earlier point, had aided his father in committing. That is, however, what the erroneous instruction required. Under it, the jury first had to find that defendant committed a predicate crime on an accomplice theory. Only after so finding could the jury then, pursuant to the instruction, "also" find criminal liability for any "other" crimes that the jury considered a natural and probable consequence of the crime that defendant had aided. Said another way, in this case, the jury could not have found the burglary to have been a natural and probable consequence of an earlier crime that

argument, however, is that it overlooks the terms of the instruction.

[7] We refer to the two burglary charges in the singular because the trial court merged them, both for conviction and sentencing. Given the evidence at trial, the convictions were based on a unitary act and a single victim, so that, despite the alternative or multiple intents alleged, defendant could be convicted of only one burglary. *See State v. White*, 341 Or 624, 640-41, 147 P3d 313 (2006) (proof of a unitary act in entering and remaining in home, even with the intent to commit more than one crime against a single victim, will support multiple charges of burglary but only a single conviction). Consequently, there is no basis in this case to distinguish between the two burglary counts for purposes of assessing prejudice.

11

defendant had aided in committing, because there was no earlier crime in the sequence of charged criminal acts. Necessarily, then, the instruction was harmless as to the burglary conviction.

The same is not true of the next crime that occurred chronologically -- *viz.,* the assault. Whether defendant's conviction on that charge could have been affected by the erroneous instruction depends on the possibility that the jury convicted defendant of burglary as an accomplice, rather than as a principal. If the jury believed defendant's testimony that only his father went inside the house, the jury's burglary verdict would have to have been based on an accomplice theory -- *viz.*, that defendant aided and abetted in his father's burglary of the house.[8] In that event, having found defendant guilty of burglary as an accomplice, the jury also could find, under the erroneous instruction, that defendant was guilty of assault if the jury concluded that his father's assault of the victim was the natural and probable consequence of the burglary. The jury could have done so without having to find, as ORS 161.155 requires, that defendant intended to promote or facilitate the assault. Defendant was, consequently, necessarily prejudiced by the erroneous instruction on his conviction for second-degree assault.[9]

---

[8] *See* ORS 164.225; ORS 164.215 (defining first-degree burglary as requiring the person to "enter[] or remain[] unlawfully" in a dwelling).

[9] The Court of Appeals reached a contrary conclusion on the assault conviction, reasoning that defendant essentially had conceded the facts that established criminal responsibility for the assault. *Lopez-Minjarez*, 236 Or App at 289. The court did not identify what those facts were. We reach an opposite conclusion, because defendant's testimony, if believed by the jury, would have permitted the jury to find that

As to the next crime that occurred chronologically -- *viz.*, the kidnapping of the victim -- the erroneous instruction was, in contrast to the assault conviction, patently harmless. Defendant conceded his direct participation in that crime. At trial, he admitted that he drove the truck away from the victim's house, with his father inside holding the victim at gunpoint. The best evidence for defendant thus established defendant's criminal liability for kidnapping in the first degree, based either on an accomplice or principal theory.[10] It therefore follows that the erroneous instruction had no significant likelihood of affecting the jury's verdict on the first-degree kidnapping charge, and it was therefore harmless insofar as that charge is concerned.

We turn then, to the two remaining convictions -- aggravated murder and felony murder. As to the aggravated murder charge, the jury could find defendant guilty, either on a principal or an accomplice theory, only if it found, among other elements, that defendant intended to kill the victim and personally did so, or intended to aid his father in killing the victim.[11] Although the state presented testimony from which the jury could so

---

defendant did not personally assault the victim and did not aid his father with the requisite intent to promote or facilitate his father's assault of the victim.

[10] Kidnapping in the first degree requires, as pertinent here, that a person, with intent to interfere with the victim's liberty, take the person from one place to another for purposes of causing physical injury to the victim. ORS 163.235; ORS 163.225.

[11] As charged, the aggravated murder counts in this case required the state to prove, among other elements, that defendant intentionally caused the victim's death to conceal the commission of the specified crimes or to conceal defendant's and his father's identities as the persons who committed those crimes, or both. *See* ORS 163.095(2)(e) (defining aggravated murder on that theory); ORS 163.115 (defining murder); ORS

13

find, defendant's testimony was to the contrary -- *viz.*, that he did not kill the victim, did not intend to kill the victim, and did not intend to aid or assist his father in killing the victim. If the jury believed defendant's testimony, the only legally correct verdict for the jury to return on aggravated murder was not guilty. The erroneous jury instruction, however, permitted the jury to accept defendant's testimony and still find him guilty if it found that the victim's murder was the natural and probable consequence of any crime that defendant earlier aided his father in committing (*i.e.*, kidnapping and burglary). If the jury approached the case in that way, it would have found defendant guilty of aggravated murder without finding that defendant had the requisite intent to commit aggravated murder. Because the erroneous instruction could have resulted in a verdict on that legally erroneous basis, the error requires reversal of defendant's aggravated murder conviction.

The final conviction that we must consider is defendant's conviction for felony murder. Under Oregon law, felony murder is committed when

"* * * a person, acting either alone or with one or more persons, * * * commits or attempts to commit any of the following crimes and in the course of and in furtherance of the crime the person is committing or attempting to commit, or during the immediate flight therefrom, the person, or another participant if there be any, causes the death of a person other than one of the participants[.]"

ORS 163.115(1)(b).[12] In this case, defendant was charged with two counts of felony

163.005 (defining criminal homicide).

[12]    Paragraphs (1)(b)(A) - (J) list the referenced crimes that may form the basis

14

murder based on defendant or his father having caused the victim's death in the course of and in furtherance of, respectively, defendant's commission of first-degree burglary and first-degree kidnapping. As we have described, the erroneous instruction did not affect defendant's convictions on those charges. Having found defendant guilty of burglary and kidnapping, the evidence would have permitted the jury to further find that a participant in those underlying felonies (either defendant or his father) caused the victim's death in the course of and in furtherance of the underlying felonies. If the jury did so find, defendant was guilty of felony murder, and the jury's verdicts on felony murder would be consistent with Oregon law. It was not necessary for the jury to find, as with the aggravated murder charge, that defendant intended to promote or facilitate the victim's murder, or that defendant even had any personal involvement in that murder.[13]

But the fact that the jury could have convicted defendant of felony murder

---

for a conviction of murder under subsection (1)(b). *E.g.*, ORS 163.115(1)(b)(C) ("burglary in the first degree as defined in ORS 164.225"); ORS 163.115(1)(b)(F) ("kidnapping in the first degree as defined in ORS 163.235").

[13] To illustrate: A, assisted by B, commits a felony crime. In the course and furtherance of that crime, A kills someone, and B has no involvement in causing the victim's death. B, nevertheless, can be found guilty of felony murder. *See, e.g., State v. Zweigart*, 344 Or 619, 633-34, 188 P3d 242 (2008) (defendant's planning of robbery, during which the victim was killed, was sufficient to convict defendant of felony murder). An affirmative defense is available, so guilt may also depend on whether B raises and proves that defense. *See* ORS 163.115(3) (it is an affirmative defense to felony murder that the defendant was not the only participant to the underlying crime, did not commit or assist in the homicidal act, was not armed, and had no reasonable ground to believe that another participant was armed and intended to engage in an act likely to cause someone's death).

15

on a proper legal theory, given these facts, is not a complete answer to the harmless error issue. The question remains whether the jury also could have convicted defendant of felony murder on a legally incorrect theory, pursuant to the erroneous natural and probable consequences instruction. We conclude, as did the Court of Appeals, that the jury could have done so.

As noted, felony murder requires the jury to find that a participant in one of several specified felonies caused the victim's death "in the course of and in furtherance of the crime that the person was committing or attempting to commit[.]" ORS 163.115(1)(b).[14] The requirement that the homicide be in the course and furtherance of the predicate felony is a familiar concept from the common-law crime of felony murder. As one authority describes it,

> "whether there is a sufficient causal connection between the felony and the homicide depends on whether the defendant's felony dictated his [or a coparticipant's] conduct which led to the homicide. If it did, and the matters of time and place are not too remote, the homicide may be 'in the commission of' the felony; but if it did not, it may not be."

Wayne R. LaFave, 2 *Criminal Law* § 14.5(f), 466 (2d ed 2003); *see generally State v. Rose*, 311 Or 274, 285, 810 P2d 839 (1991) ("Something more than a mere coincidence of time and place, however, is necessary to show that the homicide occurred 'in the course of and in furtherance of' the felony. There must have been some causal

---

[14] The statute also reaches a murder committed during "immediate" flight after the crime or its attempt, ORS 163.115(1)(b), but that theory is not involved in this case.

16

relationship between the robbery and the homicide.").  Whether the felony was completed, terminated, or withdrawn from -- any of which can be sufficient to break the causal connection between the felony and the homicide -- generally depends on whether the homicide is incidental to the felony or part of a continuing sequence of events.  *See generally* Erwin S. Barbre, Annotation, *What Constitutes Termination of Felony for Purpose of Felony-Murder Rule*, 58 ALR 3d 851 (1974) (collecting cases).[15]  That determination ordinarily is a question of fact for the jury.  *Id.* § 5, 874-76 (collecting representative cases); *see also* Charles E. Torcia, 2 *Wharton's Criminal Law* § 151 (15th ed 1994) (stating general rule).

Here, if the jury believed defendant's testimony, the jury could have found that defendant's participation in the predicate felony offenses (burglary and kidnapping) ended when defendant got out of the truck at McDonald's and his father drove away with the victim.  In effect, defendant could have been found to have withdrawn from the felony in a way sufficient to break, at least for his direct responsibility for felony murder,

---

[15]      Illustrative cases cited in the article that reflect that general approach, which appears to be universal, include:  *State v. Brown*, 7 Or 186, 209 (1879) (felony murder may be found where the predicate felony and the homicide parts are of "one continuous act"); *State v. Johnson*, 182 NC App 63, 68, 641 SE2d 364, 368 (2007) (murder can be found to be in course of felony if "there is no break in the chain of events leading from the initial felony to the act causing death, so that the homicide is part of a series of incidents which form one continuous transaction[]") (internal quotation marks omitted); *State v. Harris*, 589 NW2d 782, 792 (Minn 1999) ("So long as the underlying felony and the killing are part of one continuous transaction, it is irrelevant whether the felony took place before, after, or during the killing.").  *See also State v. Pratt*, 125 Idaho 546, 557-58, 873 P2d 800, 811-12 (1993) (felony murder can be found if killing is committed as part of a "stream of events" that began with predicate felony).

17

the series of otherwise continuous events that culminated in the victim's death. Under a correct understanding of the law, the jury, if it so concluded, then would have acquitted defendant on the felony murder charges.

The erroneous instruction, however, could have led the jury to nevertheless find defendant guilty by concluding that, although defendant did not commit felony murder because he withdrew from the underlying felony, his father independently continued the felony and committed the victim's murder in the course of it, thus committing felony murder. The jury could have further concluded that the father's felony murder was the natural and probable consequence of defendant's earlier participation in the felonies, for which the jury had found defendant responsible either as a principal or an accomplice. The jury, using the erroneous instruction, then could have found defendant criminally responsible for the felony murder that his father committed. If the jury reasoned through the felony murder charges in that way -- which it could have on this record -- the jury's verdict would be based on a legally incorrect theory. The erroneous instruction was therefore prejudicial to defendant on the felony murder convictions.

In sum, we conclude the uniform instruction at issue here, Uniform Criminal Jury Instruction 1051, incorrectly advises that a defendant can be criminally responsible for any other crime that is a natural and probable consequence of a crime that a defendant aided in committing. It was error for the trial court to give that instruction. We further conclude that the error prejudiced defendant on his convictions for assault, felony murder, and aggravated murder, and we therefore reverse those convictions. We conclude, however, that the error did not prejudice defendant on his convictions for first-

18

degree burglary and first-degree kidnapping.  We therefore affirm those convictions.

The decision of the Court of Appeals is reversed in part and affirmed in part.  The judgment of the circuit court is reversed, and the case is remanded for further proceedings.